The ST. PAUL COMPANIES, INC.,
Petitioner, Appellant,

v.

Michael A. HATCH, Commissioner of the Minnesota Department of Commerce, et al., Alleghany Corporation, Respondents.

No. C5–88–2392.

Supreme Court of Minnesota.

Dec. 15, 1989.

James B. Loken, Jeannine L. Lee, Lori A. Wagner, Faegre & Benson, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Alan I. Gilbert, Gregory P. Huwe, Peggy J. Birk, St. Paul, for Michael Hatch.

Thomas W. Tinkham, Leslie J. Anderson, David R. Abrams, Dorsey & Whitney, Minneapolis, for Alleghany Corp.

YETKA, Justice.

Is a statute which provides for a trial de novo review by the district court of a decision by the Commissioner of Commerce under Minn.Stat. § 60D.12, subd. 1 (1988) (the Insurance Holding Company Systems Act) constitutional? If so, how should such a review be conducted and what is the scope of the trial court's authority? Both the trial court and the court of appeals refused to undertake a review of the commissioner's order under the aforesaid statute and held the statute unconstitutional on its face under article III, section 1 of the Minnesota Constitution.

We reverse both the trial court and the court of appeals and remand to the trial court for trial.

Appellant, The St. Paul Companies, Inc. (hereinafter "SPCI"), appeals from the decision of the Minnesota Court of Appeals which affirmed the judgment of the Ramsey County District Court which dismissed SPCI's petition for judicial review of an order of the Commissioner of the Minneso-

ta Department of Commerce. The order, dated January 11, 1988, granted Alleghany Corporation permission under the Minnesota Insurance Holding Company Systems Act, Minn.Stat. ch. 60D, to acquire a "controlling"[1] interest in SPCI.

On January 22, 1988, SPCI filed a petition for judicial review of the order in Ramsey County District Court pursuant to Minn.Stat. § 60D.12, subd. 1, which provides for review "by trial de novo." On February 5, 1988, Alleghany filed a motion to dismiss SPCI's petition for judicial review on the grounds that section 60D.12's provision for "trial de novo" violates article III of the Minnesota Constitution by delegating non-judicial authority to the district court. By order dated August 8, 1988, the Ramsey County District Court granted Alleghany's motion to dismiss SPCI's petition. That court concluded that the commissioner's functions were primarily executive in nature; therefore, the "trial de novo" provision improperly delegated executive power to the district court.

By decision dated March 22, 1989, the Minnesota Court of Appeals affirmed the district court's judgment. 437 N.W.2d 666. This court granted SPCI's petition for review of the court of appeals' decision on May 18, 1989.

The St. Paul Companies, Inc. is a Minnesota corporation with its headquarters in St. Paul, Minnesota. SPCI employs 2,600 people in downtown St. Paul and has 10,000 employees nationwide. SPCI is the holding company for one of the largest groups of property-liability insurance underwriters in the United States. It owns five domestic Minnesota insurance companies, all of which are Minnesota corporations with their home offices in St. Paul. SPCI also owns subsidiaries engaged in investment banking and insurance and reinsurance brokerage activities. As of September 30, 1987, the total assets of SPCI were Eight Billion, Three Hundred Eight Million, Four Hundred Forty Thousand and No/100 Dollars ($8,308,440,000.00). Total sharehold-

ers' equity as of September 30, 1987, was One Billion, Seven Hundred Thirty-five Million, Three Hundred Thirty-four Thousand and No/100 Dollars ($1,735,334,000.00). The common stock of SPCI is publicly traded and quoted on the NASDAQ National Market System. In December 1987, there were about 46,301,857 shares of SPCI common stock outstanding.

Alleghany is a Delaware corporation with its headquarters in New York, New York. Through its subsidiary, Chicago Title and Trust Company, Alleghany is engaged in underwriting title insurance and trust company services. Over the past 40 years, Alleghany has controlled operating companies in the railroad, retail financial services, motor freight, metal and steel fabrication, and insurance industries. It has also, from time to time, acquired substantial equity positions in certain companies, held the stock for a short period of time, and then sold the stock at a profit. From 1949 to January 1984, except during the period from 1955 to 1960, Alleghany owned a controlling interest in Investors Diversified Services, Inc. (hereinafter "IDS"), a financial services company headquartered in Minneapolis. During this time, IDS played a leading role in the development of downtown Minneapolis, including the construction of the IDS Center, which was completed in 1973. In January 1984, Alleghany sold IDS to American Express Company. Since December 1986, Alleghany has owned the Shelby Insurance Co., an Ohio based regional property and casualty insurer.

On November 12, 1987, in accordance with Minn.Stat. § 60D.02, Alleghany filed an application with the Minnesota Department of Commerce for permission to acquire more than 10% of SPCI's common stock. The commissioner ordered that a public hearing on Alleghany's proposed stock purchase be held before an administrative law judge. Although Minn.Stat. § 60D.02, subd. 4(2) provides only that the hearing must be held within 60 days of the

---

1. The order authorizes Alleghany to acquire up to 20% of the voting securities of SPCI. Minn. Stat. § 60D.01, subd. 4 (1988) provides that "control" shall be presumed to exist if any person owns 10% or more of the voting securities of any other person.

filing of the application,[2] the commissioner ordered an expedited hearing so that he would be able to hold a hearing *and* render a final decision within 60 days. SPCI contends that this accelerated hearing procedure prejudicially curtailed its right to discovery and a fair hearing.

The administrative hearing was held on December 16 and 17, 1987. At the hearing, under Minn.Stat. § 60D.02, subd. 4, it was Alleghany's burden to show that none of the following conditions exist:

(i) after the change of control the domestic insurer would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

(ii) the effect of the acquisition of control would be substantially to lessen competition in insurance in this state or tend to create a monopoly;

(iii) the financial condition of any acquiring party might jeopardize the financial stability of the insurer, or prejudice the interest of its policyholders or the interests of any securityholders who are unaffiliated with the acquiring party;

(iv) the terms of the offer, request, invitation, agreement or acquisition are unfair and unreasonable to the securityholders of the insurer;

(v) the plans or proposals which the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest; or

(vi) the competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of policyholders of the insurer and of the public to permit the acquisition of control.

During the course of the hearing, it was revealed that, at one point, Alleghany considered various proposals to take over SPCI and prepared a detailed analysis of the feasibility of a leveraged buy-out financed by liquidating some of SPCI's assets. Alleghany admitted preparing the analysis, but argued that it had, at least for the present time, abandoned any takeover plans.

On December 29, 1987, the administrative law judge issued Findings of Fact, Conclusions and Recommendation. With respect to Alleghany's present investment plans, the administrative law judge found:

[I]t is concluded that Alleghany's present intent is, as it has stated, to limit its investment to 20% of the common stock of [SPCI]. The testimony of its executives in this regard was not successfully impeached and it appears more likely than not that it presently seeks only a limited investment in [SPCI]. It is therefore concluded that it has met its burden to show that it has no present plans to liquidate [SPCI] or to sell its assets or to merge it or to make any other material change in its business or corporate structure or management. It appears that such plans were considered and rejected in the past. What Alleghany intends in the future cannot be determined with any certainty based upon this record. What the [Insurance Holding Company Systems] Act plainly requires is an examination of present plans ("plans or proposals which the acquiring party *has* ").

Findings of Fact, Conclusions and Recommendation at 27. Although the administrative law judge found that Alleghany had no present plans to buy out SPCI, he found that if the buy-out plan Alleghany had once considered were implemented, "the evidence in this record preponderates in favor of a conclusion that it would be unfair and unreasonable to policyholders." The administrative law judge recommended that Alleghany be granted approval to acquire up to 20% of the common stock of SPCI on the condition that future purchases would have to be approved by the commissioner

2. The statute provides that the commissioner must render a final decision within 30 days

following the hearing.

after a hearing. Recognizing that such conditional approval requires a somewhat liberal construction of Minn.Stat. § 60D.02, the administrative law judge stated:

> To the extent that such an interpretation of the Act is deemed to constitute policy-making, the relevant case law establishes that an agency may, in its discretion, establish new policies in the course of its adjudicatory process. *SEC v. Chenery Corp.*, 332 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995] (1947): *Bunge Corp. v. Commissioner of Revenue*, 305 N.W.2d 779 (Minn.1981); *In re Northwestern Bell Tel. Co.*, 371 N.W.2d 563, 567–68 (Minn. App.1985).[3]

Findings of Fact, Conclusions and Recommendation at 32.

On January 11, 1988, the deputy commissioner issued Findings of Fact, Conclusions and Order, adopting the bulk of the administrative law judge's findings and conclusions and issued an order consistent with that recommended decision.

The deputy commissioner did not, however, rubber-stamp the administrative law judge's findings and conclusions. The deputy commissioner rejected that judge's treatment of the corporate citizenship issue. The deputy commissioner noted that there was considerable discussion in the proceedings regarding the admissibility and relevance of evidence bearing on the corporate citizenship of both SPCI and Alleghany. The deputy commissioner concluded that the administrative law judge improperly admitted evidence of corporate citizenship and community affairs into the record. The deputy commissioner reasoned that "an insurance regulator has special knowledge and expertise regarding the business of insurance and has no such special knowledge or expertise regarding the much broader question of corporate citizenship." The deputy commissioner's order is the fi-

nal agency action on Alleghany's application.

▆▆▆ Minn.Stat. § 60D.12, subd. 1 (1988) provides as follows:

> Any person aggrieved by any act, determination, or order or any other action of the commissioner pursuant to sections 60D.01 to 60D.13 may appeal therefrom to the district court for Ramsey county. The court shall conduct its review without a jury and *by trial de novo*, except that if all parties, including the commissioner, so stipulate, the review shall be confined to the record. Portions of the record may be introduced by stipulation into evidence in a trial de novo as to those parties so stipulating or by either party without stipulation where a witness is not available for trial.

(Emphasis added.) The lower courts gave the trial de novo provision its broadest possible meaning. In so doing, they created valid separation-of-power concerns.

Article III, section 1 of the Minnesota Constitution contains a separation-of-powers requirement and provides as follows:

> The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

In *State ex rel. Patterson v. Bates*, 96 Minn. 110, 104 N.W. 709 (1905), this court discussed article III, section 1 at length and set forth the general rule that the legislature cannot require judges to do any acts which are not in their nature judicial. *Id.* at 165, 104 N.W. at 711. The *Patterson* court stated:

> In many instances the acts which are to be done require the performance of functions, some of which are judicial and

---

**3.** A review of these cases indicates that they provide authority for the proposition offered. In *Securities & Exchange Commission v. Chenery*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the United States Supreme Court held that federal administrative agencies have the authority to fill in gaps in the framework of regulatory statutes and may do so through qua-

si-legislative promulgation of rules or by individual *ad hoc* adjudication and that the choice between these methods lies within the discretion of the agency. *Id.* at 202–03, 67 S.Ct. at 1580. In *Bunge Corp. v. Commissioner of Revenue*, 305 N.W.2d 779, 785 (Minn.1981), the Minnesota Supreme Court adopted *Chenery* in a case involving a state administrative agency.

others legislative or executive, and these are often so interwoven and connected that they cannot readily be separated and distinguished. When this is the case the court will not attempt to unravel the combination, but will sustain the act as against constitutional objection.

*Id.* at 116, 104 N.W. at 711. In discussing the history of the theory of the distribution of governmental functions, the *Patterson* court reasoned that the founders of our national government were too practical to be controlled by an overly formalistic separation-of-powers doctrine, and although "they recognized the principle in constructing the framework of the government, they violated it in practice and so distributed the powers as to create a system of checks and balances." *Id.* at 117, 104 N.W. at 712; *see also In re Hull,* 163 Minn. 439, 444, 204 N.W. 534, 536 (1925) (it is impractical to view the separation-of-powers provision from the standpoint of a doctrinaire). The *Patterson* court concluded that the separation-of-powers provision was intended to apply only to powers which are assigned by the constitution to one of the departments exclusively and that powers not specifically assigned remain properly under the control of the legislature. *Patterson,* 96 Minn. at 118, 104 N.W. at 712. Finally, the court concluded that if the acts to be performed are of an ambiguous character or are in part judicial and in part executive or legislative, the act does not violate article III, section 1 of the Minnesota Constitution. *Id.* at 118–19, 104 N.W.2d at 712–13.

Were this court to follow *Patterson,* it would need to go no further. The power exercised by the commissioner is not assigned by the constitution to any branch of government exclusively. Moreover, the commissioner's function in this case can fairly be characterized as partly judicial and partly executive in nature. The proceeding involved a "contested case" between two parties and was decided in an

adversary proceeding following notice and a hearing. The administrative law judge's decision effectively determined the rights of the individual parties on the basis of present facts. Courts are certainly within their province when determining controversies between parties concerning past or present facts. *City of Duluth v. Railroad and Warehouse Comm'n,* 167 Minn. 311, 316, 209 N.W. 10, 13 (1926). Accordingly, we could find that the deputy commissioner's function is primarily judicial in nature and, therefore, de novo review by the district court violates no separation-of-powers principles.

However, administrative law has changed greatly in the past 50 years, and the literal language of *Patterson* is no longer controlling. Moreover, the deputy commissioner can be said to be acting in an executive capacity by creating and carrying out the licensing and regulating policy of the Commerce Department in dealing with insurance companies. If a party not agreeing with the commissioner could have a completely new trial following the administrative hearing, it would be an unnecessary waste of both judicial and executive resources. Thus, today, greater deference should be given to the executive branch of government. In *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn.1977), this court stated: "[D]eference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Id.* at 824.[4]

Interpreting the "by trial de novo" language in Minn.Stat. § 60D.02 literally and broadly, as did the trial court and the court of appeals, enables the Ramsey County District Court to disregard completely the findings and conclusions of the commissioner and substitute its own. *Steenerson v. Great Northern Ry. Co.,* 69 Minn. 353, 375, 72 N.W. 713, 716 (1897) *quoted with approval in Reserve Mining Co. v. Herbst,*

**4.** *Reserve Mining Co.* involved the extremely complicated and controversial issue of where to locate the taconite tailings disposal facility for the Reserve Mining Company's plant in Silver Bay, Minnesota. *Reserve Mining Co.,* 256 N.W.2d at 811–12. There was considerable discussion and concern in that case regarding the economic impact on Silver Bay and northeastern Minnesota of a decision that would cause Reserve Mining to shut down its plant. *Id.* at 821, 841.

involved a statute that granted similarly broad powers to a district court. In *Steenerson,* this court stated:

"If by this the legislature intended to provide that the court should put itself in the place of the [Railroad and Warehouse] commission, try the matter de novo, and determine what are the reasonable rates, without regard to the findings of the commission, such intent cannot be carried out, as a statute which so provided would be unconstitutional. The fixing of rates is a legislative or administrative act, not a judicial one."

In *Reserve Mining Co.,* this court stated:

The legislature may not constitutionally delegate to the judiciary duties which are essentially administrative in character. We have consistently viewed with disfavor statutes which specify trials de novo and which attempt to confer original jurisdiction on trial courts over policy matters which are the responsibility of the legislative and executive branches.

*Reserve Mining Co.,* 256 N.W.2d at 824. Thus, we feel that it is necessary to determine the essential nature of the function being performed by the administrative agency rather than apply the *Patterson* analysis to every situation.

In *State ex rel. McGinnis v. Police Civil Service Commission,* 253 Minn. 62, 91 N.W.2d 154 (1958), this court said: "Whether a given function is nonjudicial for the purpose of determining what will be reviewed is largely historical." *Id.* at 70, 91 N.W.2d at 159. The court set forth two tests for determining whether an administrative agency is performing a non-judicial function. *Id.* The first test is to consider whether the court could have been charged in the first instance with the responsibility of performing that function. *Id.* The second test is to consider whether the function the administrative agency is performing is one that courts historically have been accustomed to performing and had performed prior to the creation of the administrative body. *Id.* at 70, 91 N.W.2d at 159–60.

In applying the above tests to the present case, it is apparent that the commissioner's function is essentially executive in nature. As to the first test, in *State ex rel. Dybdal v. State Securities Commission,* 145 Minn. 221, 176 N.W. 759 (1920), this court considered a statute which delegated the authority to regulate the business of banking and grant or deny applications for banks to the State Securities Commission. The court noted that regulation of the banking business was proper under the state's police power. *Id.* at 222, 176 N.W. at 759–60. In deciding whether to grant an application to establish a new bank, the commission was charged with the responsibility of determining, *inter alia,* whether there was reasonable public demand for the proposed bank. *Id.* at 223–24, 176 N.W. at 760. This court concluded that the commission was exercising neither judicial nor legislative power, but was, instead, an administrative body. *Id.* at 223, 176 N.W. at 760. The Court remarked that the fact that the commission determines facts and exercises judgment and discretion does not mean that it has judicial power. *Id.* This court stated:

The responsibility for a correct determination of the existence of a reasonable public demand, when the commission keeps within the limits stated, is upon the commission and not upon the court. The statute could not constitutionally put such responsibility upon the court.

*Id.* at 225–26, 176 N.W. at 761.

Similarly, with respect to the second test, regulating private businesses is a function that has historically been delegated to administrative agencies. Given the highly technical nature of the business of insurance, it is uncertain whether the district court could adequately determine that the requirements for licensing were satisfied or the interests of the policyholders would be protected.

In the present case, the trial court analogized the role of the commissioner with that of the securities commission in *State ex rel. Dybdal v. State Securities Commission.* This is an appropriate analogy. As noted by the trial court, the insurance industry, like the banking industry, is highly regulated and intimately connected to the public welfare. The court of appeals

also concluded that the present case falls within the group of cases that involve the regulatory and protective functions of the executive branch such that de novo review violates the separation-of-powers doctrine. We agree with the lower courts that the commissioner's function in this case is essentially administrative. We disagree, however, that the de novo language must be given the expansive meaning given to it by the lower courts.

■ The legislature surely has the power to insist that certain types of cases receive a more stringent review by the courts than others. The procedure that it imposes in order to achieve this result is, nevertheless, subject to constitutional limits. No legislative act can order the courts to conduct their unique judicial functions in a particular way or dictate their rules of procedure. Similarly, this court cannot dictate how legislation must be worded. This court must give great deference to an act of the legislature and interpret a statute, if possible, in such a way as to uphold its constitutionality. *In re Application of Christenson*, 417 N.W.2d 607, 610 (Minn. 1987); *see also Housing & Redevelopment Auth. v. Greenman*, 255 Minn. 396, 403, 96 N.W.2d 673, 678 (1959); *State v. Suess*, 236 Minn. 174, 180, 52 NW.2d 409, 414 (1952).

How then should this court interpret Minn.Stat. § 60D.12, subd. 1? In *City of Duluth*, which involved judicial review of the street car rate-making decisions of an administrative body, this court considered a constitutional challenge to an administrative appeal statute that provided the district court with the following scope of review:

> Upon such appeal the matters involved therein shall be tried and determined by the court without a jury, in the same manner as though originally commenced therein, provided that the findings and order of the commission shall be received in evidence upon such trial but the court shall in no event be bound thereby. * * * Upon any appeal the district court shall have jurisdiction of and shall try the whole matter in controversy including matters of fact as well as law, and

make findings upon all material facts, and in any case involving rates or the value of the street railway property shall find and determine the fair value of such property and also what is a reasonable rate of return thereon, and shall affirm, modify or reverse any order or finding of such commission as may be required by law.

*City of Duluth,* 167 Minn. at 312–13, 209 N.W. at 11. Although the court implicitly conceded that the scope of review was by trial de novo, this court rejected the constitutional challenge. *Id.* The court eliminated the constitutional defects by interpreting the above statute to mean that the district court was authorized to do everything except fix the rate. *Id.* at 317, 209 N.W. at 13. The court distinguished *Steenerson* on the grounds that the statute in that case gave greater rate-fixing power to the district court. *Id.* at 314, 209 N.W. at 11–12. The court stated that the ultimate inquiry on appeal was whether the rate fixed was confiscatory or fair and reasonable and concluded that no act of the legislature is immune from a due process inquiry by the courts merely because of some avoidable separation-of-powers concerns. *See id.* at 316, 209 N.W. at 12. The *City of Duluth* court held that the district court's findings as to existing facts which were litigated on appeal are binding on the commission and sent the matter back to the commission to put into effect orders or findings which conform to the action of the court. *Id.* at 317, 209 N.W. at 13.

Alleghany urges this court to disregard cases like the *City of Duluth* that involve due process in the context of real property and governmental "taking" issues. This we decline to do.

SPCI argues that if this court finds legitimate separation-of-powers concerns, it should construe Minn.Stat. § 60D.12, subd. 1 to eliminate those concerns. This is a compelling argument. Section 60D.12 is ambiguous. It says that there may be an appeal for "review without a jury," but then it says "by trial de novo." A "review" of a decision ordinarily contemplates something less than an outright trial de

novo. This ambiguity, coupled with *City of Duluth, supra,* which holds that we may construe the statute to eliminate constitutional infirmities, indicates, we think, how the statute should be construed.

The district court's role in such a proceeding should be limited to traditional judicial functions such as reviewing the record, including additional evidence that tends to support opposite findings, and determining whether there is sufficient evidence to support the commissioner's findings and whether the parties received procedural due process. On a matter of such great public interest, the court should make sure all relevant evidence is considered. It need not, however, retake all of the testimony given to the administrative law judge. The district court should review the evidentiary rulings of the administrative law judge. For example, in the present case, there was an allegedly privileged document in the handwriting of Alleghany's president which was produced by Alleghany, perhaps accidentally, in response to SPCI's discovery demand. This document was excluded from evidence by the administrative law judge. SPCI argued that the document was not privileged, that it was highly relevant to the issues concerning the credibility of Alleghany's officers and the existence of present plans to take over SPCI, and that this evidentiary ruling should be carefully reviewed by the district court. We think that this is precisely the type of issue the legislature was concerned about when it decided that these cases should be reviewed by the district court. The district court should hold a pretrial conference to consider this issue and determine what additional evidence, if any, should be admitted. SPCI argued below that it needs to take some depositions of people who attended the meeting where the allegedly privileged conversation referred to in the document took place. The district court should consider this argument carefully and, if appropriate, authorize additional discovery and/or receive additional testimony on this issue. The district court should, on its own motion, admit the entire record before the administrative law judge and the commissioner. It should also allow into evidence the decisions of insurance company regulators in other states where SPCI does business concerning approval or disapproval of Alleghany's purchase of a large percentage of SPCI's common stock. The findings, if any, of these other regulators as to the nature and scope of Alleghany's present plans to make material changes to SPCI should also be received into evidence. In addition, the district court should receive additional evidence on the corporate citizenship issue to the extent it is relevant to the conditions set forth in Minn.Stat. § 60D.02, subd. 4.

In sum, the role of the district court is to review the agency's findings, inferences, conclusions, and decision to determine if they are supported by substantial evidence in view of the entire record as submitted and as it may be supplemented by additional evidence received by the district court. The district court further reviews the decision to determine if it otherwise conforms to the law. The court may affirm, reverse, or modify the decision. The court may also remand the case to the commissioner for further proceedings.

We believe that this interpretation affords proper deference to the function of the executive branch while, at the same time, giving effect to legislative intent that, in insurance takeover cases, there should be a particularly careful judicial review.

The substantive rights protected by the Insurance Holding Company Systems Act, especially the rights of policyholders and the public generally, are significantly important to justify this rigorous review process. The consequences of a hostile takeover of a major corporation such as SPCI can be as devastating and widespread as the consequences of closing down a company like Reserve Mining considered in *Reserve Mining Co. v. Herbst.* After all, these decisions have a tremendous impact on the economy of this state because they involve millions of dollars and thousands of people working and living in Minnesota. One commentator described the "worst case" scenario as

> a successful offeror stripping the insurer of its liquid assets, leaving no surplus or reserves for the protection of policyholders. An offeror that is incompetent to

manage an insurer or one that imprudently expands the insurer's operation, however, equally may threaten the policyholders' security. In either situation, the insureds are powerless to protect their interests. They must simply sit on the sidelines and observe the tender offer, the outcome of which may have a profound effect on their future. None of the contestants, including the offeror, target management, and shareholders, are necessarily concerned with the policyholders' interest.

Sheffey, *The Unconstitutionality of State Insurance Takeover Statutes: An Unfortunate But Not Necessarily Final Result,* 69 Minn.L.Rev. 821, 859–60 (1985). In circumstances like these, it is proper to preserve, as much as possible, the rigorous review envisioned by the legislature. Surely, a legislative body has a right to be concerned that these decisions be correct and require that they be made only in full conformity with due process after considering all the available relevant evidence.

Accordingly, the trial court and the court of appeals are reversed, and the case is remanded to the trial court in accordance with the instructions given in this opinion.