896 F.2d 1046
 58 USLW 2515
 ALLEGHANY CORPORATION, Plaintiff-Appellant,
v.
Robert D. HAASE, Commissioner of Insurance of the State of
Wisconsin, Defendant-Appellee,
and
St. Paul Companies, Inc. and St. Paul Fire and Casualty
Insurance Company, Intervening Defendants-Appellees.
ALLEGHANY CORPORATION, Plaintiff-Appellee,
v.
John J. DILLON, Commissioner of Indiana Department of
Insurance, Defendant-Appellant,
and
St. Paul Companies, Inc. and St. Paul Fire and Casualty
Insurance Company, Intervening Defendants-Appellants.
 Nos. 89-1655, 89-2055 and 89-2056.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1989.
Decided Feb. 21, 1990.
Order on Denial of Rehearing and Rehearing En Banc April 5, 1990.
 
 Terry G. Duga, Dist. Atty. Gen., Office of Attorney General, Indianapolis, Ind., Daniel D. Stier, Office of the Attorney General, Wisconsin Dept. of Justice, Madison, Wis., Stuart D. Smith, Richard L. Bond, and John G. Rainey, Dorsey & Whitney, New York City, Donald K. Schott, Erica M. Eisinger, William J. Toman, Jeffrey B. Bartell, Quarles & Brady, Madison, Wis., Thomas W. Tinkham, Michael J. Wahoske, David R. Abrams, Dorsey & Whitney, Minneapolis, Minn., Phillip A. Terry, Brian W. Welch, McHale, Cook & Welch, Indianapolis, Ind., for Alleghany Corp.
 Daniel D. Stier, Office of the Attorney General, Wisconsin Dept. of Justice, Madison, Wis., Peter J. Rusthoven, James Strain, Barnes & Thornburg, Indianapolis, Ind., Peter Gardon, Whyte & Hirschboeck, Madison, Wis., for Robert D. Haase.
 Kathleen M. Rivera and Joseph C. Branch, Foley & Lardner, Milwaukee, Wis., Joe C. Emerson, Baker & Daniels, Indianapolis, Ind., Richard J. Urowsky, John L. Hardiman, Sullivan & Cromwell, New York City, for intervenors.
 Linley E. Pearson, Atty. Gen., Office of the Attorney General, Indianapolis, Ind., for Harry E. Eakin.
 Before POSNER and EASTERBROOK, Circuit Judges, and DUMBAULD, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 These three appeals arise from two closely related suits brought by Alleghany Corporation to invalidate, on federal constitutional grounds, portions of the insurance holding company statutes of Wisconsin and Indiana. Acting under the authority of Wis.Stat. Secs. 600.03(13), 611.72, 617.11(1), and Ind.Code Secs. 27-1-23-1 et seq., respectively, the insurance commissioners of these states turned down Alleghany's application for permission to acquire 20 percent of the common stock of The St. Paul Companies, Inc., an insurance holding company. Alleghany could have sought review of the commissioners' decisions in the courts of the respective states, but it did not do so. The appeals present the single question whether, because of this omission, the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), forbids the federal courts to entertain Alleghany's suits. A district judge in Wisconsin said yes and dismissed Alleghany's suit, 708 F.Supp. 1507 (W.D.Wis.1989), precipitating Alleghany's appeal (No. 89-1655). A district judge in Indiana said no but certified his ruling for immediate appeal under 28 U.S.C. 1292(b), and we accepted appeals from his ruling by both the Indiana insurance commissioner (No. 89-2055) and St. Paul (No. 89-2056). St. Paul had been permitted to intervene in both suits--on the commissioners' side. Its management does not want to be taken over by Alleghany, and fears that a takeover bid may ensue if Alleghany obtains 20 percent of its stock.
 
 
 2
 St. Paul owns insurance companies incorporated in ten separate states, each of which is among the 47 states that have nearly identical statutes requiring anyone who wants to acquire more than ten percent of the stock of either an insurance company incorporated in the state, or the parent of such a company, to obtain the approval of the state insurance commissioner. The commissioner is to render a written decision after a full hearing, the decision to be based on specified criteria including the applicant's integrity and financial strength and the competitive effects of the proposed acquisition. Alleghany filed applications in all ten states. Four granted the application. Four--including Wisconsin and Indiana--turned it down. It is pending in one (Delaware). And it was withdrawn in another (Illinois) pending the determination, in proceedings already begun to challenge the rulings by the insurance commissioners in the other states, of the constitutionality of the insurance company holding statutes. Proceedings there are--galore. The four approvals gave rise to two appeals to state courts by St. Paul from the commissioners' ruling. In one, a state supreme court reversed the decision of the lower courts not to review the commissioner's approval, and remanded for that review, St. Paul Cos. v. Hatch, 449 N.W.2d 130 (Minn.1989); the other is pending. The four rejections gave rise to four suits by Alleghany challenging the constitutionality of insurance holding company statutes--the two on appeal to us plus two on appeal to the Eighth Circuit. In one of the Eighth Circuit cases a district court had abstained under Younger. In the other the district court had refused to abstain, proceeded to the merits, and held North Dakota's statute unconstitutional as an unreasonable burden on commerce. Alleghany Corp. v. Pomeroy, 698 F.Supp. 809, 700 F.Supp. 460 (D.N.D.1988). Although the McCarran-Ferguson Act provides "that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States," 15 U.S.C. Sec. 1011--thus eliminating, one might suppose, any challenge to the insurance holding company statutes based on congressional silence (the predicate for invoking the "dormant" commerce clause)--the court in Pomeroy, citing SEC v. National Securities, Inc., 393 U.S. 453, 459-61, 89 S.Ct. 564, 568-69, 21 L.Ed.2d 668 (1969), distinguished between the business of insurance and the ownership of an insurance company, and held that state regulation of the ownership was not insulated by the Act. Whether this interpretation is correct is not an issue on this appeal; the defendants do not contend that it is frivolous.
 
 
 3
 The controversy between Alleghany and the insurance commissioners is a live one. Even though Alleghany has already been turned down by several of the commissioners, and it needs the permission of all to go ahead with the acquisition, this is only if the statutes are constitutional. If they are not, Alleghany does not require permission under these statutes.
 
 
 4
 If Alleghany had sought judicial review of the Wisconsin or the Indiana commissioner's ruling in a state court, as it could have done, Wis.Stat. Sec. 227.53(1); Ind.Stat. Sec. 4-21.5-5-3(a), and had lost, it could not have maintained a suit in federal district court to invalidate the ruling, whether on constitutional or any other grounds--provided only that the state courts would have had jurisdiction to consider Alleghany's federal claims, and they would have. Wis.Stat. Sec. 227.57(8); Ind.Code Sec. 4-21.5-5-14(d)(2). The qualification is essential, but if it is satisfied the suit in federal court would be barred by res judicata. Button v. Harden, 814 F.2d 382, 384 (7th Cir.1987). The commissioners and St. Paul argue that Alleghany should not be permitted to obtain access to a federal forum by refusing to exercise its unquestioned right to judicial review of the commissioners' rulings in state court, review that would encompass any federal as well as state grounds for questioning the rulings and that would keep Alleghany in state court.
 
 
 5
 It will help in analyzing the issue to step back a pace and ask, could these two federal court suits be maintained if Alleghany had not applied to the commissioners for approval? Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), implies an affirmative answer. It holds that federal courts have the power to enjoin threatened state action that, if carried out, would violate the plaintiff's federal rights. True, there is always a potential question of "ripeness" (on which see generally Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n, 461 U.S. 190, 200-01, 103 S.Ct. 1713, 1720-21, 75 L.Ed.2d 752 (1983)) in an attack on merely threatened action. Is the threat sufficiently imminent and probable to create a real controversy between the plaintiff and the state officials? Only if the plaintiff can show that it is can he maintain a federal suit. Wooley v. Maynard, 430 U.S. 705, 710, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977); Steffel v. Thompson, 415 U.S. 452, 458-59, 94 S.Ct. 1209, 1215-16, 39 L.Ed.2d 505 (1974); National Metalcrafters v. McNeil, 784 F.2d 817, 821-22 (7th Cir.1986); Illinois v. General Electric Co., 683 F.2d 206, 209-10 (7th Cir.1983). The cost of, and delay in, obtaining regulatory approvals from ten states before a hostile tender offer could even be made would have entitled Alleghany to maintain, against objections based on lack of ripeness, federal suits in all ten states to enjoin the enforcement of the state's insurance holding company statute, alleged to be an unreasonable burden on interstate commerce because each state is seeking to regulate a transaction having its major incidence elsewhere. Browning-Ferris Industries v. Alabama Dept. of Environmental Management, 799 F.2d 1473, 1478 (11th Cir.1986); City of Altus v. Carr, 255 F.Supp. 828, 836 (W.D.Tex.1966) (three-judge court), aff'd per curiam, 355 U.S. 35 (1966). Examples of similar suits in this circuit attacking regulatory obstacles to hostile takeovers include MITE Corp. v. Dixon, 633 F.2d 486 (7th Cir.1980), affirmed as Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and Dynamics Corp. v. CTS Corp., 794 F.2d 250 (7th Cir.1986), reversed, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).
 
 
 6
 Our conclusion that Alleghany could have brought its suits challenging the insurance holding company statutes without first applying to the insurance commissioners for permission to acquire the St. Paul Companies would be mistaken if there were a general requirement of exhausting state remedies before bringing federal suits challenging state action. For then Alleghany would have to apply to the commissioner and if turned down would have to appeal to a state court--and by operation of res judicata would be forever denied a federal forum unless the Supreme Court chose to review the decision of the highest state court to which Alleghany could appeal an adverse decision. Lynk v. LaPorte Superior Court, 789 F.2d 554, 564 (7th Cir.1986); cf. id. at 563 (discussing Rooker-Feldman doctrine). But there is no general requirement of exhausting state judicial or administrative remedies before bringing a federal suit, although there are important exceptions to this generality, such as the requirement of exhaustion in the habeas corpus statute. 28 U.S.C. Sec. 2254(b). The Supreme Court has held that 42 U.S.C. Sec. 1983, the principal vehicle for challenging state action on federal grounds and the one used by Alleghany in these suits, contains no requirement of exhausting administrative remedies. Patsy v. Florida Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Exhaustion of judicial remedies is sometimes required, in effect, by the rule of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), but any general requirement of exhausting state judicial remedies before bringing a federal civil rights suit would spell the demise of Ex parte Young, since the decision in the state suit usually would have preclusive effect on the federal. We are not authorized to issue a death warrant for Ex parte Young.
 
 
 7
 All this is not to say that anyone who brings suit in federal court to enjoin the operation of a state statute, or other state action, is, by virtue of Ex parte Young, automatically entitled to an injunction, provided that all jurisdictional requirements such as ripeness are satisfied and the plaintiff can demonstrate that his federal rights have indeed been violated. The right to an injunction depends on more than just presenting a good legal claim to a court having jurisdiction. Part of the more consists of general equitable considerations and another part, though it is applicable only to a subclass of injunction suits, consists of considerations of comity--the interest in harmonious relations between sovereigns and therefore between the federal government and the states. It is in regard to considerations of equity and comity that the doctrine of Younger v. Harris comes into play. Its central meaning is that a federal district court may not, save in exceptional circumstances, enjoin, at the behest of a person who has actually or arguably violated a state statute, a state court proceeding to enforce the statute against that person. Illinois v. General Electric Co., supra, 683 F.2d at 213. His remedy is to interpose his federal claims as a defense in that action. The adequacy of alternative remedies is a standard ground for denying an injunction, although today one only sporadically invoked. The unseemliness of a federal court's interrupting a proceeding brought by state officials to enforce state law in state courts provides an additional, and the decisive, ground, based on comity, for denying such an injunction.
 
 
 8
 These grounds are at their strongest when, as in Younger itself, the state is prosecuting a person for a crime. Allowing him to block the prosecution by obtaining an injunction from a federal judge would come close to allowing a state criminal defendant to remove his criminal prosecution into federal court--a course that would wreck the balance between federal and state prerogatives that is struck in the habeas corpus statute. And it would do this gratuitously, since the defendant can interpose his federal defenses in the state action and will even have a later shot at a federal forum--not only the Supreme Court under the certiorari jurisdiction, but also, and more practically, the district court under the habeas corpus jurisdiction, provided only that he is convicted and imprisoned, and if not his interest in having access to a federal forum will be much reduced.
 
 
 9
 The grounds for denying a federal-court injunction are only slightly attenuated when instead of a criminal prosecution the state has brought a civil enforcement action, such as the suit to close a pornographic movie theater in Huffman v. Pursue, Ltd., 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). And there is only a slight further attenuation when, as in Hicks v. Miranda, 422 U.S. 332, 350, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975), the state proceeding is begun after the defendant in that proceeding has brought his federal injunctive suit. It is not the order of the suits that matters but the fact that the federal plaintiff has violated (or is alleged to have violated) state law. The state normally is entitled to prosecute or otherwise proceed against the violators of its laws in its own courts without interruption by a federal district court. But the principle of Ex parte Young stands unimpaired in cases in which the federal plaintiff has not violated state law, has not exposed himself to a state enforcement proceeding, is not a defendant in such a proceeding, but merely seeks to sweep away an illegal obstacle to his activities. Illinois v. General Electric Co., supra, 683 F.2d at 213.
 
 
 10
 This clearly would be such a case if Alleghany had sued the state insurance commissioners before applying for permission to acquire St. Paul. And if this is right, then the argument that by virtue of having applied to the commissioners Alleghany forfeited its right under Ex parte Young to bring a suit to enjoin the enforcement of the state insurance holding company statutes yields a paradox. If accepted, the argument would deter firms in Alleghany's position from applying for a state license before challenging the constitutionality of the state's licensing scheme, since the application would channel the firm into the state court system even if it preferred to be in federal court. With firms thus induced to avoid the state regulatory process, the principles of federalism would be affronted rather than protected. Moreover, the argument we are examining implies that instead of Alleghany's filing four suits in order to challenge the regulatory scheme (suits against the four insurance commissioners who turned it down), it would have had to file ten suits--suits against all the insurance commissioners whose permission was required under state law; for only by suing the commissioners in advance of applying for permission could Alleghany maintain these suits in federal courts.
 
 
 11
 If the state insurance commissioners had the power to decide issues of federal constitutional law, if decisions by the commissioners were given preclusive effect by the courts of the commissioner's state, and if procedures employed by the commissioners were deemed adequately "judicial" in character to compel the federal courts to give the commissioners' findings the same preclusive effect as a matter of federal common law, University of Tennessee v. Eliott, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), then the doctrine of res judicata would force Alleghany--once it had filed an application--to seek review of the commissioner's decision in state court. Alleghany could not split its constitutional claim. Watson Rural Water Co. v. Indiana Cities Water Corp., 540 N.E.2d 131 (Ind.App.1989); Patzer v. Board of Regents, 763 F.2d 851, 857 (7th Cir.1985) (Wisconsin law). There are an awful lot of ifs here. We discuss only one. The defendants concede that the commissioners lack the power to determine the constitutionality of the statutes they enforce, in which event there is no issue of splitting. The concession may be premature. It is true that this limitation on the power of administrative agencies, state and federal, is extraordinarily common; the California Constitution, for example, declares that "an administrative agency ... has no power to declare a statute unenforceable," Art. III, Sec. 3.5(b); Beltran v. California, 871 F.2d 777, 783 (9th Cir.1988); Fresh Int'l Corp. v. Agricultural Labor Relations Bd., 805 F.2d 1353, 1362 n. 14 (9th Cir.1986). And it is true that the limitation is assumed in a large number of cases, of which the following are merely illustrative: Public Utilities Comm'n v. United States, 355 U.S. 534, 539, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958); Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); Mathews v. Diaz, 426 U.S. 67, 76, 96 S.Ct. 1883, 1889, 48 L.Ed.2d 478 (1976); Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 629, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986); Continental Air Lines, Inc. v. Department of Transportation, 843 F.2d 1444, 1456 (D.C.Cir.1988); Denberg v. Railroad Retirement Bd., 696 F.2d 1193, 1196 (7th Cir.1983). But we know of no case where the limitation had actually been challenged, for example as violating the supremacy clause. In defense of the limitation it could be argued that while every public official has a paramount duty to obey the Constitution, not every such official is competent to interpret the Constitution, and it is therefore a sensible division of labor to confine interpretive questions to judicial officers. We need not resolve the issue here. The defendants have conceded that the state commissioners cannot determine the constitutionality of the insurance holding company statutes, and their concession binds them.
 
 
 12
 So res judicata is not a bar to these suits. Nor, to get back on the main track, is Younger. Alleghany has not violated state law, because it has not attempted to consummate its attempted takeover of St. Paul without obtaining the required permissions from the insurance commissioners. It is not the target of a state enforcement proceeding. The plaintiff in Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)--a case of which the present defendants make much--had brought a federal suit to prevent a state court from requiring the posting of an appeal bond in an ongoing state litigation; there is no state litigation here. Texaco had been sued for violating state law (tortious interference with contract rights), had lost in the trial court, and was suing in federal court to protect its right of appeal in the state court system. The suit was held barred by Younger. Texaco arguably had violated state law; Alleghany has not. The state courts are of course open to Alleghany--even more clearly, indeed, than they were open to Texaco--but they are open to anyone who complains that state officials are violating his federal rights; if that were a ground for abstention, federal courts would not have to decide the 23,558 civil rights suits filed by state prisoners in federal district courts last year.
 
 
 13
 The principle on which we are proceeding is dramatically illustrated by Wooley v. Maynard, supra. The plaintiff was seeking to enjoin a state statute that required the slogan "Live Free or Die" to be embossed on license plates. He had already been convicted three times of violating the statute. He had not appealed any of these convictions. Yet Younger was held not to bar his suit; since he was seeking only prospective relief he was free to invoke the aid of a federal court, even though he could easily have raised his federal claim as a defense in the state criminal cases. 430 U.S. at 710-11, 97 S.Ct. at 1433-34. The Younger doctrine is designed for the case where an injunction would interfere with a state court's efforts to enforce state law. Alleghany seeks neither to abort a state proceeding nor to obtain a resolution of state law questions in federal court. It asks a federal court to enjoin on federal grounds a state law whose meaning has been settled by state officials.
 
 
 14
 Any intimations of a broader scope for Younger arising from the fact that the plaintiff in Pennzoil was not a public agency were promptly scotched by New Orleans Public Service, Inc. (NOPSI ) v. Council of City of New Orleans, --- U.S. ----, 109 S.Ct. 2506, 2518-20, 105 L.Ed.2d 298 (1989). The essential thing in Pennzoil, it is now clear, is that once the state trial court rendered a judgment against Texaco, the state had a substantial interest in enforcing the procedures that it had established to regulate appeals. For Texaco to sue in federal court to enjoin collection was like a convicted state criminal defendant's suing in federal court to enjoin the state from requiring him to appeal within a fixed period of time.
 
 
 15
 NOPSI not only clarifies the scope of Pennzoil, but is a case much like the present one. A local ratemaking body had refused to grant the request of a power company to be permitted to raise its rates. The company could have challenged the refusal in state court, but instead brought a federal suit to enjoin the refusal on federal grounds. The Supreme Court held Younger inapplicable.
 
 
 16
 The precise holding of NOPSI is that since ratemaking is a legislative rather than judicial function, an injunction would not interrupt a state judicial proceeding. The defendants in our case therefore ask us to characterize the denial of the permissions sought by Alleghany as judicial in character, and the administrative proceeding plus state judicial review as a unitary judicial proceeding, since "for Younger purposes, the State's trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in mid-process would demonstrate a lack of respect for the State as sovereign." Id. 109 S.Ct. at 2518. See also Huffman v. Pursue, Ltd., supra, 420 U.S. at 608-09, 95 S.Ct. at 1210-11. The defendants are correct that for these purposes an administrative proceeding can be " 'judicial in nature' "; the Supreme Court so held with reference to attorney disciplinary proceedings in Middlesex Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 433-34, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982). See also Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., supra, 477 U.S. at 627, 106 S.Ct. at 2722. That was just a conclusion, but a conclusion justified by the fact that to remove such proceedings into federal district court would be precisely the sort of federal judicial interference with a state's effort to bring the violators of its laws to book that Younger interdicts. Whether the state proceeds against malefactors administratively or judicially is a distinction irrelevant to the policy behind Younger (Bethune Plaza, Inc. v. Lumpkin, 863 F.2d 525, 528 (7th Cir.1988)), especially since the federal Constitution does not prescribe the allocation of powers between branches of state government--it does not require the states to have separate branches. United Beverage Co. v. Indiana Alcoholic Beverage Comm'n, 760 F.2d 155 (7th Cir.1985). But there has been as yet no malefaction here, and we cannot see any difference between the refusal by a state agency to allow a power company to raise its rates and the refusal by a state agency to allow one company to buy another. Cf. St. Paul Cos. v. Hatch, supra, 449 N.W.2d at 134-37. If federal judicial intervention does not demonstrate disrespect for state sovereignty in the first case, neither does it in the second.
 
 
 17
 This case is actually a weaker case for Younger abstention than was NOPSI. The regulatory order in NOPSI was in response to alleged negligence by the power company in failing to minimize its costs by diversifying its sources of power. Functionally, it was a remedial order. Indeed, in effect though not in legal form it was "punishment" for past misconduct by the firm. A state has, as we have been at pains to stress, a strong interest in punishing its malefactors, and this whether the punishment takes the form of a rate order or of a seizure of contraband or of a criminal sanction. The ratemaking order in NOPSI might therefore have been analogized to the disciplinary proceeding in Middlesex. No such analogizing to Middlesex (or to Dayton Christian Schools ) is possible here. The critical element of misconduct--emphasized ad nauseam not only in this opinion but in our earlier opinion in Illinois v. General Electric Co., supra, 683 F.2d at 213--is missing. We repeat the holding of that decision: Younger is confined to cases in which the federal plaintiff had engaged in conduct actually or arguably in violation of state law, thereby exposing himself to an enforcement proceeding in state court which, once commenced, must be allowed to continue uninterrupted to conclusion (if no state proceeding is ever commenced, there is of course no Younger bar). This is not such a case. Within the potential domain of Younger marked out by this distinction, there are additional limits illustrated by NOPSI, but we need not consider their bearing.
 
 
 18
 We note, finally, that decisions from other circuits support our result. Ford Motor Co. v. Insurance Commissioner, 874 F.2d 926, 933-35 (3d Cir.1989); Kercado-Melendez v. Aponte-Roque, 829 F.2d 255, 258-62 (1st Cir.1987).
 
 
 19
 The decision of the district court in Indiana, refusing to abstain, is affirmed (Nos. 89-2055, 89-2056); the decision of the district court in Wisconsin, abstaining, is reversed (No. 89-1655).
 
 
 20
 EASTERBROOK, Circuit Judge, concurring.
 
 
 21
 I join the court's opinion but add a few words about the commissioners' "concession" that they cannot evaluate the constitutionality of the laws they administer. How can a state "concede" that the Constitution is not supreme for its executive branch? The Supremacy Clause, Art. VI cl. 2, provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ...". The Constitution is supreme for commissioners of insurance no less than for legislators and judges. Concessions surrender valuable entitlements; here the concession asserts an immunity from federal rules, an act of aggrandizement rather than abasement. As the court observes, 896 F.2d at 1051, the concession is common, but no case I could find holds that state agencies have the immunity from federal law they say they possess.
 
 
 22
 State agencies could disregard federal rules only if the second portion of the Supremacy Clause--"the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."--meant that the Constitution is supreme only for judges. Yet the nullification debates are behind us. No one believes these days that legislative and executive branches of state governments may ignore the Constitution and federal law until slapped with an injunction. The Supremacy Clause establishes a hierarchy of rules, binding on all governmental actors. The Illinois Commerce Commission may not, for example, yank the certificates of two interstate carriers whose merger was approved by the Interstate Commerce Commission and issue an opinion saying something like: "We ignore the Interstate Commerce Act when making our decisions, and if you don't like that go sue us." Federal law is supreme for all state actors, at all times, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."
 
 
 23
 Federal courts proclaim, when requiring state officials to pay damages for disobedience to federal law (including constitutional doctrine), that state actors must follow the federal rules without waiting for litigation. National rules govern even though no case on all fours has been rendered. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Kurowski v. Krajewski, 848 F.2d 767 (7th Cir.1988). Local governments acting on the basis of local rules that have been preempted by federal ones must pay damages. E.g., Golden State Transit Corp. v. Los Angeles, --- U.S. ----, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); Community Communications Co. v. Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). Governmental bodies do not even get the benefit of the qualified immunity available to their minions. Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Governments are liable only for their laws and other policies, so the universe of damages actions against governmental bodies is precisely the one in which, according to the "concession" in this case, agencies are free to disregard federal law.
 
 
 24
 Officials may not act as if state law is the only law. After Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), made it pellucid that the Constitution forbids discrimination in the operation of public schools, a school board could not say that it was required by state law to segregate its students and had to keep doing this until some judge told it to stop. See Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). So too with state laws discriminating on account of sex. Once Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held that states may not exclude women from jury venires, it was unnecessary to bring 49 more suits, or perhaps 3,041 more (one per county), to achieve compliance throughout the nation. There were 83,166 local governments in the United States in 1987 and oodles of state agencies, 1988 Statistical Abstract of the United States Table 452; I shudder to think that none of them need comply with the Constitution until told to by a judge, one clause at a time. Under the Supremacy Clause, state administrative agencies may--must--conform their conduct to constitutional norms without waiting to be hit by a judicial order. Even the concept of a "judicial" order supposes a separation of powers that states are not required to observe. Bethune Plaza, Inc. v. Lumpkin, 863 F.2d 525, 528 (7th Cir.1988). States may merge the powers of administration and adjudication, as in Middlesex Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), or may abolish judicial review. Reallocations of this kind could not abrogate the Supremacy Clause.
 
 
 25
 The most sonorous justification for the commissioners' position is that they are following the law and leaving to orderly adjudication claims that their law is defective. Such an approach supposes that state rules are the whole law of the commissioners' jurisdictions, that national rules are a form of foreign law. Yet the Supremacy Clause integrates the legal systems. We have one body of law, with a hierarchy among rules.
 
 
 26
 The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty. Every citizen of a State is a subject of two distinct sovereignties, having concurrent jurisdiction in the State,--concurrent as to place and persons, though distinct as to subject-matter.... The disposition to regard the laws of the United States as emanating from a foreign jurisdiction is founded on erroneous views of the nature and relations of the State and Federal governments. It is often the cause or the consequence of an unjustifiable jealousy of the United States government, which has been the occasion of disastrous evils to the country.
 
 
 27
 Claflin v. Houseman, 93 U.S. 130, 136-37, 23 L.Ed. 833 (1876). If state laws conflict, the commissioners will attempt to reconcile these laws as best they can and may enforce one at the expense of another. When the conflicting pair is one state and one federal, the duty to resolve the conflict is no less, and the Supremacy Clause names the winner. To say otherwise is to misunderstand the structure of our federal system. And it is an offense against that structure to force persons holding federal rights to wait for vindication, and pay lawyers to secure it, when persons holding identical entitlements under state law face no such obstacles.
 
 
 28
 This does not mean that constitutional questions are the first order of business for an administrator any more than for a court. Judges regularly deal with statutory questions before they take up constitutional ones. Even though deferral increases slightly the expense of obtaining a favorable decision, it is justified to ensure appropriate respect for rules established by the political branches. States might separate their decision-making not only temporally but also among officials, some specializing in statutory interpretation and others in constitutional law. Here the parallel to judicial practice breaks down. An insurance commissioner does not resolve questions of state law and then turn to the state's Attorney General (or even to a court) for authoritative guidance on federal law; the commissioner resolves questions of state law and then issues a binding order. The person claiming a federal right is directed to comply. A judge does not resolve the statutory point, issue an injunction, and then turn to the Constitution. A judge resolves the questions of federal law before issuing a binding decision; agencies must do this too.
 
 
 29
 Abjuring administrative "authority" to act on the basis of federal law creates problems under 42 U.S.C. Sec. 1983 as well as the Supremacy Clause, for it amounts to a demand that people abandon their federal remedies. Indiana and Wisconsin insist that the state as an entity will listen to constitutional (and other federal) claims only in state court. Yet Sec. 1983 creates an entitlement to litigate in federal court, free of any efforts by the state to limit access. Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). Given the doctrine of claim preclusion, which 28 U.S.C. Sec. 1738 enforces, Migra v. Warren City School District Board of Education, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), a state rule allocating to state courts all resolution of claims under federal law amounts to: "This state will ignore your entitlements under federal substantive law unless you give up your right to litigate in federal court." Felder and, e.g., Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), show that no such demand may be made or honored.
 
 
 30
 Often we are told that chaos would break out if everyone made his own decision about which legal rules are enforceable. Let us leave difficult questions to the courts, the refrain goes, so that we may have order. Although the division of labor is beneficial in the main--no one who has watched tax protesters find fantastic propositions in the Constitution, see Coleman v. CIR, 791 F.2d 68 (7th Cir.1986), could tolerate the thought of revenue clerks making up and enforcing private versions of constitutional tax law--the proposition that there must be a chain of command takes us only so far. Public officials owe their allegiance to the Constitution first, federal laws second, and state laws third. Even a command from the President of the United States does not relieve public employees of their duty to follow the Constitution. United States v. Ehrlichman, 546 F.2d 910 (D.C.Cir.1976). See also United States v. Konovsky, 202 F.2d 721, 730-31 (7th Cir.1953) (reliance on a superior's order does not negate specific intent in a prosecution under 18 U.S.C. Sec. 241 for violating the Constitution). Cops on the beat must follow Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), rather than state laws that may permit or even direct them to use deadly force in apprehending felons. Police who prefer state to federal law will find themselves in the dock.
 
 
 31
 Perhaps functionaries are entitled to follow the orders of their superiors, unless clearly unlawful, so that there may be efficient and consistent administration. A commissioner of insurance is no functionary; he commands a cadre of lawyers. Any legal staff good enough to interpret the arcane insurance laws these officials must apply can look up constitutional doctrine as well. State agencies, in conjunction with state attorneys general, possess ample legal skill--and more experience, I wager, than a randomly selected judge of a court of general jurisdiction who may not see a claim under the dormant Commerce Clause during his career. We should require no less of a commissioner of insurance than of a police official or a prison warden.
 
 
 32
 At all events, the "constitutional" question here turns out to be a dispute about the meaning of the McCarran-Ferguson Act, 15 U.S.C. Secs. 1011-15. If that statute authorizes states to regulate insurance holding companies, then there is no remaining issue, see Western & Southern Life Insurance Co. v. State Board of Equalization, 451 U.S. 648, 652-55, 101 S.Ct. 2070, 2074-76, 68 L.Ed.2d 514 (1981). If the McCarran-Ferguson Act does not apply, then the jig is up under the dormant Commerce Clause, see Edgar v. MITE Corp., 457 U.S. 624, 643-46, 102 S.Ct. 2629, 2641-43, 73 L.Ed.2d 269 (1982). No insurance commissioner could say with a straight face that he and his staff lack expertise needed to interpret the McCarran-Ferguson Act. They do it all the time.
 
 
 33
 The role of the Constitution in administrative decision-making turns out to be irrelevant to this litigation. Under 28 U.S.C. Sec. 1738, the decision of a state official--be he called "judge" or "commissioner"--has the same preclusive effect in federal litigation as in state litigation. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). All agree that the decisions of these commissioners of insurance are reviewable in some court. Suits filed in state courts could not have been met with claims of preclusion. The preclusive effect would be the same--none--if the commissioners had considered and rejected the Commerce Clause arguments on the merits. Indiana and Wisconsin do not view administrative decisions as preclusive in their own courts, so they are not preclusive in federal court.
 
 ORDER
 
 34
 Less than a week after we issued our decision, the Eight Circuit decided two parallel cases involving Alleghany's challenge to the state insurance holding company statutes-decided them opposite to, but apparently unaware of, our decision. Alleghany Corp. v. McCartney, 896 F.2d 1138 (8th Cir. 1990); Alleghany Corp. v. Pomeroy, (8th Cir. 1990). We are not persuaded to abandon our position, but the emphasis which the opinions placed on Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), prompts us to add this brief note on that case, which we cited only in passing in our original opinion.
 
 
 35
 The state brought suit in Huffman to close down a pornographic theater. It obtained a judgment in state court, and the theater owner did not appeal, but instead brought a suit in federal court to enjoin the enforcement of the state statute and thus the closing of the theater. The Supreme Court held that Younger abstention was proper in these circumstances. Indeed it was. The theater owner had violated the state statute, and if you violate a state statute and the state prosecutes you (not necessarily by means of a criminal proceeding) in state court, you must stay there. That is Younger in a nutshell. It is not this case, since Alleghany has violated no state law, and since the state has not proceeded against it in state court. Alleghany applied for a license and was turned down. It did not engage in the activity for which it had sought the license, and therefore did not expose itself to an enforcement proceeding. It challenged the licensing statute. It was not required by Younger or any other doctrine to file that challenge in state court.
 
 
 36
 The defendant-appellant, John J. Dillon III, filed a petition for rehearing and suggestion of rehearing en banc on March 7, 1990. No judge in regular active service has requested a vote on the suggestion of rehearing en banc, and all of the judges on the panel have voted to deny rehearing. The petition for rehearing and suggestion for rehearing en banc is DENIED.
 
 
 
 *
 Hon. Edward Dumbauld, of the Western District of Pennsylvania, sitting by designation