FILED
United States Court of Appeals
Tenth Circuit

**January 13, 2009**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

DENA K. BROWN, by her brother and
next friend, Donald C. Brown,

     Plaintiff-Appellant,

v.

ROBERT M. DAY, in his official
capacity as Director, Kansas Division
of Health Policy and Finance,

     Defendant-Appellee.

No. 06-3387

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:06-CV-2212-KHV-JPO)**

---

Molly M. Wood, Stevens & Brand, L.L.P., Lawrence, Kansas, for the Plaintiff-
Appellant.

Reid Stacey, Kansas Health Policy Authority, Topeka, Kansas, for the Defendant-
Appellee.

---

Before **HENRY**, Chief Judge, **EBEL** and **TYMKOVICH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Plaintiff-Appellant Dena Brown sued Defendant-Appellee Robert Day, the Director of Kansas's Division of Health Policy and Finance ("HPF"),[1] in federal court pursuant to 42 U.S.C. § 1983, after Day issued a Final Order terminating Brown's Medicaid benefits. Brown alleged that Day's decision, which purported to execute newly enacted Kansas law, violates federal Medicaid statutes and regulations. The federal district court initially granted Brown's motion for a preliminary injunction, holding that HPF had acted arbitrarily and capriciously in terminating Brown's benefits. Shortly thereafter, Day moved to dismiss, claiming Younger v. Harris, 401 U.S. 37 (1971), and its progeny compelled the federal court to abstain from exercising jurisdiction over Brown's action. The district court agreed and dismissed the case. Brown appeals from this application of the Younger abstention doctrine.

There are two main issues presented. This court is asked to determine whether there is an ongoing proceeding in this case, and whether any ongoing proceeding in this case is the type entitled to Younger deference. Because we decide this case on the basis of the type of proceeding at issue, we do not reach the open question whether the Younger doctrine compels a federal court to decline jurisdiction over a federal cause of action initiated to challenge a state administrative agency's final decision when appeal to state court was possible.

---

[1]The HPF has since been renamed the Kansas Health Policy Authority.

The dispositive issue in this case is whether a federal plaintiff's challenge to a state administrative agency's decision to terminate her Medicaid benefits is the type of proceeding entitled to <u>Younger</u> deference. From the <u>Younger</u> acorn – a holding barring federal courts from enjoining ongoing state criminal prosecutions – a judicial oak has grown. Now, federal courts must also decline jurisdiction over cases brought to enjoin state civil or administrative enforcement proceedings. As discussed below, however, there appears to be a distinction between cases where the state proceeding involves the state coercively enforcing its laws and cases where state proceedings involve the federal plaintiff seeking a remedy for a past wrong. Those cases where the federal plaintiff has sought a state remedy are not the type of cases subject to <u>Younger</u> abstention. We must consider whether Brown's challenge to the HPF's decision to terminate her Medicaid benefits is such a coercive or remedial proceeding. Because we determine that the proceeding is remedial and not entitled to <u>Younger</u> abstention, we need not reach the ongoing proceeding issue.

In sum, we conclude that abstaining in this case would extend the <u>Younger</u> doctrine to remedial cases, in contravention of Congress's intent in enacting § 1983 and of Supreme Court precedent. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## I.    BACKGROUND

Plaintiff-Appellant Dena K. Brown is a developmentally disabled adult. Although she was forty-six years old at the time this suit was filed on her behalf, she functions roughly at the level of a three- or four-year-old child. As a result of her disabilities, Brown resides at a private, not-for-profit residential care facility run by Starkey, Inc. The services she receives at the facility cost approximately $5,000 per month. Brown's monthly income is $864, which she receives in Social Security benefits because of her disabilities. Until August 2005, Medicaid payments bridged the gap between Brown's income and the cost of her care facility.

Defendant-Appellee Robert M. Day is the Director of the HPF, a division of Kansas's Department of Administration. Day's duties include determining and implementing policies for medical assistance programs, including Medicaid.

## A. The Medicaid Program

Congress established the Medicaid program pursuant to Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 – 1396v. See Houghton ex rel. Houghton v. Reinertson, 382 F.3d 1162, 1164 (10th Cir. 2004). By means of the program, Congress invited the states to cooperate with the federal government in providing health care to persons who cannot afford such care. See Harris v. McRae, 448 U.S. 297, 301 (1980). If a state opts to participate, it receives financial assistance from the federal government, on the condition that the state

operates its Medicaid program in compliance with federal statutory and regulatory requirements. Kansas has opted to participate in the Medicaid program.

The statutory framework requires all participating states to cover the "categorically needy"; this class consists primarily of persons who receive cash assistance from the Social Security Administration. See 42 U.S.C. § 1396a(a)(10)(A)(i). In addition, "at the option of the State," medically needy persons may also be covered. Id. § 1396a(a)(10)(A)(ii). This class includes those persons who are "18 years of age or older and [are] permanently and totally disabled." 42 U.S.C. § 1396d(a)(v). Kansas has opted to cover this class. See Kan. Admin. Reg. 30-6-85(c).

To ensure the Medicaid program serves needy persons, the program includes income and resource eligibility thresholds. Congress has nevertheless forbidden the states from employing methodologies for determining an applicant's income or resources that would render an individual ineligible for Medicaid where that individual is eligible for Supplemental Security Income ("SSI") from the Social Security Administration. See 42 U.S.C. § 1396a(r)(2)(A)(i). In determining a person's eligibility for Medicaid, states must use reasonable standards that only factor in income and resources which are available to the recipient and which would affect the person's eligibility for SSI. Id. § 1396a(a)(17).

The applicable regulations state that a resource is not available if the person has no authority to liquidate it as a property right. 20 C.F.R. § 416.1201(a)(1). The Social Security Administration explained that assets in a trust are available resources only "[i]f [the beneficiary has] the legal authority to revoke the trust or direct the use of the trust assets for his/her own support and maintenance . . . ." Social Security Administration, Program Operating Manual System ("POMS") § SI 01120.200(D)(2). The trust's terms "and/or . . . State law" determine this issue. Id.

**B. Brown's Eligibility for Medicaid**

When Brown's mother passed away in 2003, Brown became the beneficiary of a residuary trust. The trust corpus includes approximately $15,000 in cash, two annuities totaling about $23,000, and the rights to 160 acres of agricultural land in Kingman County, Kansas (valued at approximately $30,000). Brown's brother, Donald, is the trustee. Given Brown's disabilities, the trust provides the Trustee with the discretion to make a distribution of trust income or principal for Brown's benefit. Brown herself, however, has no legal authority to compel distribution under the trust. As a result, Kansas did not deem Brown's trust assets "available resources" before 2004. Other than the trust, Brown apparently possesses no other assets that would allow her to pay the difference between her Social Security benefits and the costs of her residential care facility.

**C. HPF Proceedings Regarding Brown's Medicaid Benefits**

Kansas amended its applicable law, effective July 1, 2004. After that date, Kansas deemed trust resources available "to the extent, using the full extent of discretion, the trustee may make any of the income or principal available to the applicant or recipient of medical assistance." Kan. Stat. § 39-709(e)(3). In accordance with this amendment, HPF notified Brown that after August 31, 2005, she would no longer receive medical assistance because she was not medically needy.

Brown challenged this decision by requesting a hearing before HPF. She sought a hearing because it was not clear at that time whether Kansas's new law could be applied retroactively to her. Moreover, during the pendency of her appeal, she continued to receive benefits. The hearing officer overturned the decision to terminate Brown's Medicaid benefits on January 15, 2006, apparently reasoning that the new Kansas law did not apply to trusts set up prior to its enactment.[2]

However, in a Final Order dated April 26, 2006, Day reinstated HPF's original decision to terminate Brown's benefits. In the order, Day informed Brown that she had a right to file a petition for state judicial review of the order and that such a petition must be filed within thirty days.[3] Following up on this

---

[2]This decision is not in the record.

[3]This alerted Brown to the applicable portions of Kansas's Act for Judicial Review and Civil Enforcement of Agency Actions ("Judicial Review Act"), Kan.

(continued...)

final decision, on April 30, 2006, HPF wrote Brown to inform her that "[w]e are closing your medical assistance and food stamp case effective May 31, 2006 because your resources exceed the maximum allowable amount for your household size."

**D. Brown's Federal Lawsuit**

Just a few days before her benefits were due to terminate, Brown filed suit in the U.S. District Court for the District of Kansas against Day in his official capacity as director of HPF. She thus declined to petition the Kansas state courts for review as provided for under the Kansas Judicial Review Act. See Kan. Stat. § 77-613(b). In her federal complaint, Brown claimed, pursuant to 42 U.S.C. § 1983, that HPF violated federal Medicaid law when it determined that the assets in the trust left to Brown by her mother are "available assets." As a remedy, Brown sought a declaratory judgment and an injunction barring HPF from terminating her Medicaid coverage.

---

[3](...continued)
Stat. §§ 77-601 – 77-631. Section 77-606 of the Judicial Review Act provides that the Act "establishes the exclusive means of judicial review of agency action." Section 77-613 provides the relevant time-line for judicial review of the result of Kansas administrative proceedings. That section mandates that "a petition for judicial review of a final order shall be filed within 30 days after service of the order." Id. § 77-613(b). Because HPF served its final decision on Brown by mail, three days are added to the 30-day window. See id. § 77-613(e). The parties do not dispute that Brown failed to petition for judicial review in the Kansas district court within 33 days of the service of HPF's final decision; instead, Brown filed her federal suit 29 days after receiving HPF's decision.

The district court granted Brown's motion for a preliminary injunction on June 8, 2006. The court "conclude[d] that in terminating plaintiff's Medicaid coverage based on K.S.A. § 39-709(e)(3), HPF has acted arbitrarily, capriciously and in contravention of 42 U.S.C. § 1396a(r)(2)(A)(I)."

About a month after the district court issued this order, Day filed a motion to dismiss or stay, arguing that the federal court should abstain in light of Brown's option to appeal HPF's decision to the Kansas state courts. Day reasoned that Brown had turned her back on an ongoing state proceeding when she failed to pursue judicial review in the Kansas state courts. In addition, Day attached a document entitled "Petition for Civil Enforcement" that he claimed he would shortly file in Kansas state court. The Petition claims, in relevant part, that "Don Brown, as trustee of the Brown Trust, should be liable to the [HPF] under K.S.A. 39-719a for all Medical Assistance provided to Dena Brown from July 1, 2004 to the present." The record is silent as to whether Day or the HPF ever filed this petition.

The district court dismissed the federal case, holding that Younger v. Harris and its progeny commanded abstention because (1) Brown initiated a federal action instead of exhausting her state appellate options; (2) the Kansas state court provided an adequate forum for Brown's challenge to the HPF decision; and (3) Kansas has an interest in "[p]rotecting the fiscal integrity of public assistance programs."

Brown then filed a motion to alter or amend the judgment, challenging the court's abstention. In response, the district court explicated more thoroughly its rationale for concluding that there was an ongoing state proceeding entitled to Younger deference. The court overruled Brown's motion to alter or amend the original judgment. Brown timely appealed the dismissal of her case.

## II.    DISCUSSION

The issue presented here is whether a federal district court must abstain where the federal plaintiff has previously requested a hearing and received a final order regarding an agency's decision to terminate benefits. We review de novo a district court's decision to abstain pursuant to Younger. Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d 1160, 1163 (10th Cir. 1999).

Under Younger and its progeny,

[a] federal court must abstain from exercising jurisdiction when: (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings "involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies."

Id. (quoting Taylor v. Jaquez, 126 F.3d 1294, 1297 (10th Cir. 1997)).

In considering these three conditions, this court "must be sensitive to the competing tension between protecting federal jurisdiction and honoring principles of Our Federalism and comity." Taylor, 126 F.3d at 1296. Critically, this court must keep in mind that abstention "is the exception, not the rule," and hence

should be "rarely . . . invoked, because the federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them." Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992) (citation and internal quotations omitted). Nonetheless, Younger abstention is "non-discretionary . . . absent extraordinary circumstances," if the three conditions are indeed satisfied. Amanatullah, 187 F.3d at 1163.[4]

The initial prong of the Younger inquiry involves two sub-parts. This court must determine whether there is an ongoing state proceeding. See id. at 1163-64; see also Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1242 (10th Cir. 2001). The court must also decide whether that proceeding is the type of state proceeding that is due the deference accorded by Younger abstention. See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans ("NOPSI"), 491 U.S. 350, 369 (1989) ("Respondents' case for abstention still requires, however, that the Council proceeding be the sort of proceeding entitled to Younger treatment."). Both of these issues raise questions of first impression for this court. Because we decide this case based on the type of proceeding, we

---

[4]The Court has clarified that at least two varieties of "extraordinary circumstances" exist: (1) where the plaintiff makes a showing of bad faith or harassment by state officials responsible for the prosecution or enforcement action and (2) where the state law or regulation to be applied "is 'flagrantly and patently violative of express constitutional prohibitions.'" Trainor v. Hernandez, 431 U.S. 434, 442 n.7 (1977) (quoting Younger, 401 U.S. at 53-54); see also Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996).

decline to decide whether a system for appealing a state administrative order creates a ongoing proceeding for Younger purposes. We hold that this case is not the type that warrants abstention. Accordingly, the district court erred in dismissing the case.

## A. The Type of Ongoing Proceeding

As noted above, there are two aspects of the "ongoing proceeding" inquiry, whether there is an ongoing proceeding and whether it is the type afforded Younger deference. The Supreme Court, in Ohio Civil Rights Committee v. Dayton Christian Schools, Inc., 477 U.S. 619 (1986), clarified some of the occasions when Younger deference was appropriate and some occasions when it was not. In this vein, the Court distinguished its prior holding in Patsy v. Florida Board of Regents, 457 U.S. 496 (1982), that a federal discrimination claim could proceed without exhaustion or deference to the state proceeding. The court distinguished Patsy on the ground, inter alia, that the Patsy administrative proceedings were remedial rather than coercive.[5] See Dayton Christian Schs., 477

---

[5]Similarly, in an attempt to cabin the Younger doctrine, the Court has suggested that Younger abstention is limited to situations where the "civil proceedings" in question (1) are enforcement proceedings or (2) "involv[e] certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." NOPSI, 491 U.S. at 368. Although that analysis also suggests there should not have been Younger abstention in this case, we will use the dichotomy between remedial and coercive administrative proceedings set forth in Dayton Christian Schools, 477 U.S. at 627 n.2, as the touchstone for determining whether the administrative proceeding is the type of

(continued...)

U.S. at 627 n.2. This court has yet to delineate a test for determining whether a state proceeding is remedial or coercive. Hence, we turn to the decisions of our sister circuits.

---

[5](...continued) proceeding that merits <u>Younger</u> abstention. We prefer the coercive/remedial distinction because our sister circuits tend to use that articulation. <u>See</u> <u>Moore v. City of Asheville</u>, 396 F.3d 385, 388 (4th Cir. 2005); <u>Majors v. Engelbrecht</u>, 149 F.3d 709, 712 (7th Cir. 1998); <u>O'Neill v. City of Philadelphia</u>, 32 F.3d 785, 791 (3d Cir. 1994); <u>cf.</u> <u>Maymo-Melendez v. Alvarez-Ramirez</u>, 364 F.3d 27, 36 (1st Cir. 2004). Also, the <u>Younger</u> pedigree is rooted in state coercive action (namely criminal proceedings) that parties were seeking to enjoin in federal court. The <u>Younger</u> doctrine originated in concerns that federal plaintiffs might stymie state coercive proceedings by bringing suit in the federal courts. <u>See</u> <u>Younger</u>, 401 U.S. at 46 (relying on "the fundamental policy against federal interference with state criminal prosecutions"). This same motivating concern made its way into later <u>Younger</u> decisions expanding the doctrine to state court civil proceedings. <u>See</u> <u>Moore v. Sims</u>, 442 U.S. 415, 423 (1979) (holding that federal abstention was required where state civil proceedings centered on a child-abuse statute that was "in aid of and closely related to criminal statutes" (quotation omitted)); <u>Trainor</u>, 431 U.S. at 444 (holding that federal court erred in not abstaining where state secured writ of attachment as result of civil fraud proceeding and federal plaintiff challenged attachment statute; noting that "state authorities also had the option of vindicating these policies through criminal prosecutions" (quotation omitted)); <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 604 (1975) ("[W]e deal here with a state proceeding which in important respects is more akin to a criminal prosecution than are most civil cases."); <u>cf.</u> <u>NOPSI</u>, 491 U.S. at 367-68 ("Although our concern for comity and federalism has led us to expand the protection of <u>Younger</u> beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, it has never been suggested that <u>Younger</u> requires deference to a state judicial proceeding reviewing legislative or executive action." (citations omitted)). The coercive/remedial distinction is close kin to the distinctions drawn by the Court in the civil <u>Younger</u> cases.

- 13 -

As discussed in depth below, the most compelling test – one crafted by the First Circuit – asks the court to consider two issues in deciding whether Dayton Christian Schools or Patsy controls.  First, we must query whether the federal plaintiff initiated the state proceeding of her own volition to right a wrong inflicted by the state (a remedial proceeding) or whether the state initiated the proceeding against her, making her participation mandatory (a coercive proceeding).  Second, we must differentiate cases where the federal plaintiff contends that the state proceeding is unlawful (coercive) from cases where the federal plaintiff seeks a remedy for some other state-inflicted wrong (remedial).  Even this test is not entirely determinative; below, we also discuss other factors that may distinguish remedial proceedings from coercive ones.

Here, despite Day's claim to the contrary, the state court administrative proceedings were not coercive.  Brown initiated the state administrative proceeding after her benefits were summarily terminated.  The state did not compel her to participate in the proceedings.  Moreover, Brown seeks not to enjoin the state proceedings, but to secure relief from the state's allegedly unlawful conduct by recovering her Medicaid benefits.  Accordingly, this state proceeding was not the type of proceeding entitled to Younger deference.

## B. Dayton Christian Schools' Modification of Patsy

As noted above, <u>Younger</u> originally sought to prevent federal courts, sitting in equity, from enjoining state prosecution of criminal defendants. <u>See</u> <u>Younger</u>, 401 U.S. at 46; <u>see also</u> <u>Huffman</u>, 420 U.S. at 602. Through a series of cases, the Court expanded the <u>Younger</u> abstention doctrine to state civil enforcement cases (<u>Huffman</u>) and administrative agency proceedings (<u>Dayton Christian Schools</u>). However, in extending the <u>Younger</u> doctrine to state administrative proceedings, the Supreme Court had to explain why <u>Patsy</u> (which did not require deferral to state proceedings) did not apply.

Accordingly, in <u>Dayton Christian Schools</u>, the Court asserted:

> The application of the <u>Younger</u> principle to pending state administrative proceedings is fully consistent with <u>Patsy v. Florida Board of Regents</u>, which holds that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court. Unlike <u>Patsy</u>, the administrative proceedings here are <u>coercive rather than remedial</u>, began before any substantial advancement in the federal action took place, and involve an important state interest.

477 U.S. at 627 n.2 (emphasis added) (citations omitted).

Seizing on this language, the lower courts have required that federal plaintiffs "perfect" their § 1983 claims by exhausting state administrative remedies only where the state administrative proceedings are coercive. <u>See</u> <u>Moore</u>, 396 F.3d at 388 ("[W]e hold that a defendant to a coercive state administrative proceeding must exhaust his state administrative and judicial remedies and may not bypass them in favor of a federal court proceeding . . . .");

Majors, 149 F.3d at 712 ("For purposes of Younger abstention, administrative proceedings are 'judicial in nature' when they are coercive – i.e., state enforcement proceedings."); O'Neill, 32 F.3d at 791 ("We therefore hold that state proceedings remain 'pending,' within the meaning of Younger abstention, in cases . . . where a coercive administrative proceeding has been initiated by the State in a state forum . . ."); id. at 791 n.13 (noting the "critical distinction" between Dayton Christian Schools and Patsy is the coercive/remedial distinction); cf. Maymo-Melendez, 364 F.3d at 36 ("Huffman is a reliable guide only where full-fledged state administrative proceedings of a judicial character and, arguably, of a coercive nature, are directed against the federal plaintiff.").[6]

The essence of each of these opinions is that a state's enforcement of its laws or regulations in an administrative proceeding constitutes a coercive action, exempt from Patsy and entitled to Younger deference. Other administrative proceedings fill the "remedial" category and remain subject to Patsy's holding that a federal § 1983 plaintiff need not exhaust state administrative remedies.

---

[6]These opinions echo that of Judge Posner: "[Younger's] central meaning is that a federal district court may not, save in exceptional circumstances, enjoin, at the behest of a person who has actually or arguably violated a state statute, a state court proceeding to enforce the statute against that person." Alleghany Corp. v. Haase, 896 F.2d 1046, 1050 (7th Cir. 1990), vacated on other grounds, Dillon v. Alleghany Corp., 499 U.S. 933 (1991).

**1. Differentiating Remedial from Coercive Administrative Proceedings**

The First Circuit has provided the clearest guidance as to how to decide whether a state administrative proceeding is coercive or remedial. In <u>Kercado-Melendez v. Aponte-Roque</u>, 829 F.2d 255 (1st Cir. 1987), the court analyzed a § 1983 action initiated by a Puerto Rican school superintendent claiming that she had been fired because of her political beliefs. <u>Id.</u> at 257-58. After receiving notice that she had been fired, Kercado opted not to file an administrative appeal and, instead, proceeded with her § 1983 action in federal court. The defendant, the Secretary of Puerto Rico's Department of Public Instruction, contended that Kercado's failure to avail herself of the administrative appeal process required <u>Younger</u> abstention. <u>Id.</u> at 258.

A divided panel of the First Circuit rejected this argument. In the process, it highlighted two critical distinctions between <u>Dayton Christian Schools</u> and <u>Patsy</u>. The panel focused first on the "crucial distinction . . . that in <u>Patsy</u> the state proceeding was an option available to the federal plaintiff on her own initiative to redress a wrong inflicted by the state" whereas in "other abstention cases" the participation of the federal plaintiff in the state administrative proceeding was "mandatory." <u>Id.</u> at 260. Second, the panel noted that "[i]n <u>Dayton Christian Schools</u> and similar cases, the state proceeding is itself the wrong which the federal plaintiff seeks to correct via injunctive relief under section 1983." <u>Id.</u> These two considerations provide a starting point for

- 17 -

analyzing whether a state proceeding is coercive (and therefore entitled to Younger deference) or remedial.[7]

A third factor emerges from a review of the proceedings at issue in the cases where our sister circuits have held that state administrative and judicial proceedings are ongoing proceedings entitled to Younger deference. In these cases, the federal plaintiff sought to thwart a state administrative proceeding initiated to punish the federal plaintiff for a bad act. Thus, a common thread appears to be that if the federal plaintiff has committed an alleged bad act, then the state proceeding initiated to punish the plaintiff is coercive.

In Maymo-Melendez, the First Circuit held that the district court should have abstained from hearing a federal claim brought by a horse trainer whose license had been suspended because he had administered performance-enhancing drugs to his horses. See 364 F.3d 34-37. The trainer had failed to pursue administrative remedies available within the Puerto Rican Racing Board. See id. at 34. Thus, unlike in Kercado-Melendez, in Maymo-Melendez there was an underlying bad act by the federal plaintiff being punished by Puerto Rico.

Similarly, in Laurel Sand & Gravel, Inc. v. Wilson, the Fourth Circuit held that abstention was appropriate where the plaintiff had committed an alleged bad

---

[7]Indeed, these considerations echo the Seventh Circuit's reasoning in Haase: "Younger is confined to cases in which the federal plaintiff had engaged in conduct actually or arguably in violation of state law, thereby exposing himself to an enforcement proceeding in state court . . . ." Haase, 896 F.2d at 1053.

act. 519 F.3d 156, 166-67 (4th Cir. 2008). The case arose after the Maryland Department of Environment concluded that Laurel Sand & Gravel ("Laurel"), the federal plaintiff, had violated Maryland's Dewatering Act. 519 F.3d at 160-61. Pursuant to the Act, Maryland had compelled Laurel, a mining company, to replace a well that had run dry in Laurel's zone of influence. Id. at 161. In holding abstention appropriate, the Fourth Circuit relied on its 2005 decision in Moore. Id. at 165-67 (citing Moore, 396 F.3d at 388). In Moore, a federal plaintiff sought to challenge the City of Asheville's noise ordinance, after he had been cited for violating the ordinance twice (the pertinent bad acts). 396 F.3d at 388. Mr. Moore opted not to appeal either citation to the North Carolina courts. Id. at 388-89. In essence, of course, Mr. Moore sought to protest his noise citations – and thereby challenge the state-initiated enforcement proceedings against him.

In the same vein, the Third Circuit, in O'Neill, upheld abstention where the federal plaintiffs sought to challenge Philadelphia's parking ticket procedures in federal court, but had not exhausted state judicial remedies. 32 F.3d at 787-88. The plaintiffs had amassed a slew of parking tickets over the years and sought to avoid paying them. Id. at 788-89. Finally, the apposite Seventh Circuit case dealt with a decision by the Indiana State Board of Nursing to suspend the license of a nurse who had allegedly euthanized elderly patients. Majors, 149 F.3d at 711-12. The nurse sought to bar the suspension proceedings. Id.

Each of these cases addressed state administrative enforcement proceedings; that is, each originated with the state's proactive enforcement of its laws (horse training regulations, noise ordinances, parking ticket procedures, and licensing laws for the nursing profession). As such, each federal case arose out of situation where the federal plaintiff had engaged in misconduct and sought to block proceedings that would ultimately impose punishment for that misconduct.[8]

## 2. Whether the HPF proceeding (and state judicial review thereof) is remedial or coercive

Even assuming the unity of the administrative proceeding and the possibility of a subsequent petition for state court judicial review (a proposition we decline to establish), the district court properly abstained in the instant case only if the proceeding before HPF was coercive rather than remedial. In the district court's original decision to abstain, it did not address the distinction

_____

[8]Of the circuits that have addressed the ongoing-proceeding issue – and declined jurisdiction on Younger grounds – only the Eighth Circuit's opinion in Alleghany Corp. v. McCartney, 896 F.2d 1138 (8th Cir. 1990), involved a non-coercive administrative proceeding. There, Alleghany applied to Nebraska's Director of Insurance for permission to purchase shares of stock in the parent company of a Nebraska insurance company. See id. at 1140. The Director denied the application pursuant to the Nebraska Insurance Holding Companies Act. Id. at 1141. Alleghany then sought to challenge the constitutionality of the Act in federal court. Id. The federal district court abstained, and the Eighth Circuit upheld that decision. In so doing, the Alleghany court inexplicably ignored the import of Patsy; indeed, nowhere in McCartney did the Eighth Circuit even mention Patsy, let alone distinguish it. Moreover, the Eighth Circuit's McCartney decision conflicted with the Seventh Circuit's conclusion, regarding the same federal plaintiff's identical claims (albeit in Wisconsin and Indiana). See Haase, 896 F.2d at 1053.

between remedial and coercive proceedings. Instead, the court simply cited Huffman for the proposition that "Younger's exhaustion requirement is well established." Only after Brown sought to have the district court alter or amend its judgment did the court analyze the issue raised by Patsy. Looking to O'Neill, the court recognized that "remedial administrative proceedings [are] those brought 'to vindicate a wrong which ha[s] been inflicted by the State." (Citing O'Neill, 32 F.3d at 791 n.13).

Despite this guidance, the court found that the "defendant claimed that plaintiff was violating state law by collecting Medicaid benefits for which she was ineligible. . . . Under Kansas law, the termination of benefits to ineligible recipients is an enforcement mechanism designed to address violations of state Medicaid law." As such, the court held the HPF administrative proceeding "was coercive for purposes of Younger because plaintiff initiated her administrative hearing as part of the state's overall law enforcement scheme." The court cautioned that it was a "difficult question," and noted that the court's conclusion still left room for some administrative proceedings that would be categorized as remedial.

The district court thereby implied that Brown had violated Kansas's Medicaid eligibility law and that the state had, as a consequence, terminated her benefits. The administrative proceedings that followed this decision were,

according to the district court, necessarily coercive because they stemmed from Kansas's decision to terminate Brown's benefits.

We disagree with this characterization of the HPF proceedings. The district court's standard for distinguishing coercive from remedial proceedings would divorce <u>Younger</u> abstention from its traditional roots. <u>See</u> <u>Huffman</u>, 420 U.S. at 604 ("[W]e deal here with a state proceeding which in important respects is more akin to a criminal prosecution than are most civil cases.").[9] That is, <u>Younger</u> originated in situations where federal involvement would block a state's efforts to enforce its laws. <u>See</u> <u>Kercado-Melendez</u>, 829 F.2d at 260 ("Those cases [<u>Dayton</u> <u>Christian Schools</u> and similar cases] involved claims by plaintiffs that constitutional rights would be violated by virtue of the operation of the state proceedings."). In those situations, "[c]omity and federalism concerns are at their highest." <u>Id.</u>

Here, however, Brown initiated a challenge to Kansas state action by requesting a hearing before the HPF. Kansas did not mandate that she participate in any such proceedings. Rather, HPF had summarily terminated her benefits, in

---

[9]<u>Huffman</u> also discounted the federal plaintiff's concerns about exhausting state appellate remedies by noting that "where a final decision of a state court has sustained the validity of a state statute challenged on federal constitutional grounds, an appeal to this Court lies as a matter of right." 420 U.S. at 605 (citing 28 U.S.C. § 1257(2)). Of course, federal plaintiffs no longer have such a right to an appeal because § 1257 now provides the Supreme Court discretion to grant <u>certiorari</u>. <u>See</u> Supreme Court Case Selections Act, Pub. L. 100-352, 102 Stat. 662 (1988).

accordance with Kansas's new law. Brown alleged that the application of this new law to her violates federal law because it contravenes certain terms of the federal-state Medicaid pact. The state proceedings themselves are not the challenged state conduct.

Moreover, Brown committed no cognizable bad act that would have precipitated state coercive proceedings. This critical distinction is highlighted by HPF's threat – after Brown had already secured a preliminary injunction from the federal court – to enforce Kansas's new eligibility law against Brown by seeking to recover "all Medical Assistance provided to [Brown] from July 1, 2004 to the present." This threatened petition, which HPF claimed it would file in Kansas state court, was styled a "Petition for Civil Enforcement." See Kan. Stat. § 77-624(a) (authorizing a Kansas state agency to "seek enforcement of its rule and regulation or order by filing a petition for civil enforcement in the district court"). Aside from being a transparent attempt to secure a dismissal on Younger grounds and aside from the fact that the record does not reflect that the petition was ever filed, the threat merely highlights the remedial nature of Brown's challenge to HPF's decision to terminate her benefits.

Because the type of ongoing proceeding at issue would be remedial, not coercive, we hold that the district court improperly abstained in this case.

III. CONCLUSION

These legal issues are undoubtedly difficult. Solicitude for state proceedings counsels one result, the federal courts' "virtually unflagging" duty to exercise jurisdiction counsels another. In the § 1983 context, it is especially useful to remember why the federal courts' duty to exercise their jurisdiction is so imperative: Congress specifically created a federal cause of action enforceable in federal courts. For the above reasons, we conclude that the district court improperly abstained because even if there were an ongoing proceeding, it would not be the type subject to Younger abstention.[10] We REVERSE and REMAND for proceedings consistent with this opinion.

--------

[10]Because we decide this case based on the first factor, we need not consider the final two Amanatullah factors, involving adequacy of the state forum and extent of the state interest. However, we note that the standard for the third factor has been eroded of late. That is, this court and others have abridged the third prong of the Younger inquiry, asking only whether the state interest is important, see Amanatullah, 187 F.3d at 1164-65, rather than asking whether the issue "involve[s] important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." Id. at 1163 (quoting Taylor, 126 F.3d at 1297) (emphasis added).

The district court held that the "third requirement of Younger is met because important state interests are implicated in this case." Specifically, the court noted the state's interest in "[p]rotecting the fiscal integrity of public assistance programs" and in "construing state statutes with regard to federal law challenges to those statutes." However, the court did not mention the obvious federal interest in ensuring that Kansas does not enact and enforce laws that contravene the Medicaid federal-state covenant. Given that Congress created the Medicaid program as a cooperative federal-state endeavor, it would be peculiar to hold that a state's handling of Medicaid issues is a "matter[] which traditionally look[s] to state law for their resolution or implicate[s] separately articulated state policies." See Amanatullah, 187 F.3d at 163 (quotation omitted). Therefore, this third factor would necessitate a comprehensive analysis were we to reach it.

*No. 06-3387, Brown v. Day*

**TYMKOVICH**, J., dissenting.

By filing a claim under 42 U.S.C. § 1983 in federal court, Dena Brown circumvented ongoing and coercive administrative proceedings in the State of Kansas. Dissatisfied with the outcome of the administrative process at the agency level, she could have sought judicial review in Kansas state courts. Instead, Brown chose to abandon Kansas administrative process altogether, co-opting the federal court in her undertaking. *Younger* abstention exists to ensure federal courts respect their state counterparts by abstaining in deference to ongoing state judicial proceedings. *See Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."). The doctrine applies here, and the district court properly abstained from adjudicating Brown's lawsuit. We should therefore affirm.

The majority instead reverses the district court's abstention. Because I disagree with (1) the majority's conclusion that the proceedings in question were remedial rather than coercive, and (2) its failure to continue and find that Brown's judicial proceeding was ongoing, I respectfully dissent. Once Brown started down the path of administrative relief, *Younger* abstention prevents us from letting her detour into federal court in these circumstances.

### 1. The Coercive-Remedial Distinction

The majority errs in holding that Brown's administrative proceedings were remedial rather than coercive. As I understand the distinction, these proceedings—properly characterized as aimed at enforcing state Medicaid laws against Brown—were coercive.

Our court has yet to address the coercive-remedial distinction in applying *Younger* to administrative proceedings. Does the distinction even apply?

The Supreme Court mentioned the distinction for the first and only time in a footnote in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627 n.2 (1986) (*Dayton*). There, the Court sought to reconcile the "application of the *Younger* principle to pending state administrative proceedings" with *Patsy v. Florida Board of Regents*, 457 U.S. 496 (1982), "which holds that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court." *Dayton*, 477 U.S. at 627 n.2. The Court noted that, "[u]nlike *Patsy*, the administrative proceedings here are *coercive rather than remedial*, began before any substantial advancement in the federal action took place, and involve an important state interest." *Id.* (emphasis added).

The Court did not say what it meant by "coercive" and "remedial." *Patsy* dealt with a state's denial of employment opportunities to a teacher, 457 U.S. at 498, while *Dayton* dealt with a state's civil rights commission seeking to enforce state laws against a school district's decision to fire a teacher, 477 U.S. at

- 2 -

621–22. In other words, only in *Dayton* was the government enforcing state laws. In *Patsy*, the state merely acted as an employer choosing not to do something, in this case promote an employee.

The *Dayton* Court did not specifically say that *Younger* could apply only to coercive administrative proceedings, and the very distinction has been criticized. *See, e.g.*, Harry T. Edwards, *The Changing Notion of "Our Federalism,"* 33 Wayne L. Rev. 1015, 1029 n.42 (1987) ("I find the Court's distinction between 'coercive' and 'remedial' administrative proceedings to be unpersuasive. If anything, the purposes behind § 1983 argue more strongly for allowing the federal plaintiff to avail herself of the federal forum in 'coercive' cases." (citation omitted)).

The Supreme Court nonetheless must have thought the distinction important, because otherwise no need for differentiating between coercive and remedial proceedings exists. The Court could have simply reasoned that because a federal plaintiff in *Dayton* had already initiated state administrative proceedings, the non-exhaustion principle of *Patsy* and *Monroe v. Pape*, 365 U.S. 167 (1961), did not apply. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 609 n.21 (1975) (making this very point). But the Court went further and distinguished *Patsy* along the coercive-remedial criterion. The distinction thus carries some meaning, and we, like several other circuits have done, must flesh it out. *See Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 166 (4th Cir. 2008); *Stroman*

*Realty, Inc. v. Martinez*, 505 F.3d 658, 662 (7th Cir. 2007) (citing *Majors v. Engelbrecht*, 149 F.3d 709, 712 (7th Cir. 1998)); *Planned Parenthood of Greater Iowa, Inc. v. Atchison*, 126 F.3d 1042, 1047 (8th Cir. 1997); *O'Neill v. City of Philadelphia*, 32 F.3d 785, 791 n.13 (3d Cir. 1994); *Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 260 (1st Cir. 1987).

### a. Standard for Adjudicating the Coercive-Remedial Distinction

While I agree with the majority that the distinction must be addressed, I disagree with the articulated standard.

The Supreme Court's failure to explain what types of proceedings are coercive and what types are remedial produced a circuit split on the issue. On the one hand, the First Circuit looks to *who initiated* the administrative process. If it was the federal plaintiff, then the proceedings are remedial; if the state, coercive. *Kercado-Melendez*, 829 F.2d at 260 (explaining *Patsy* and *Dayton* along the lines of who initiates the administrative proceedings). The majority finds this approach attractive.

The Third, Fourth, and Seventh Circuits, on the other hand, all focus on the underlying nature and substance of the administrative proceedings, asking whether the proceedings can be characterized as state enforcement proceedings. If they can, they are coercive, which is to say "judicial in nature"; if not, remedial. *Majors*, 149 F.3d at 712 ("For purposes of *Younger* abstention, administrative proceedings are 'judicial in nature' when they are coercive—i.e.,

state enforcement proceedings . . . ."); *see also Laurel*, 519 F.3d at 166 (tying together the terms "coercive" and "judicial in nature"); *O'Neill*, 32 F.3d at 791 n.13 (explaining the coercive nature of the proceedings in *Dayton* as marked by the state's motivation "to enforce a violation of state law").

The district court below found the wiser approach to be one that looks to the underlying nature and substance of the proceedings rather than to the initiating party. *Brown v. Day*, 477 F. Supp. 2d 1110, 1116 (D. Kan. 2007). I agree. First, the Supreme Court in *Dayton* likely employed the coercive-remedial distinction to limit the extension of *Younger* to those administrative proceedings—and only those administrative proceedings—that are most like *Younger* itself, which was a criminal case. *See Moore v. City of Asheville, N.C.*, 396 F.3d 385, 393 (4th Cir. 2005) (explaining similarly the Court's extension of *Younger* only to *coercive* civil proceedings in *Huffman*, "mindful that the doctrine was originally applied to protect the state interests represented in *criminal* prosecutions"); Patrick J. Smith, Note, *The Preemption Dimension of Abstention*, 89 Colum. L. Rev. 310, 326–27 (1989) (recognizing the interrelationship between the enforcement nature of state proceedings and the importance of such proceedings to the state). By making the distinction turn on the underlying nature and substance of the administrative proceedings, we can ensure *Younger* abstention applies only to proceedings—like criminal prosecutions—of paramount

importance to the state. The approach that looks to who initiates state administrative process, on the other hand, does not have this advantage.

Second, focusing primarily on who initiates administrative process fails to recognize that the labels "remedial" and "coercive" can simply be opposite sides of the same coin. If a federal plaintiff initiates a state administrative process, the First Circuit's approach in *Kercado-Melendez* would call that process remedial. But that federal plaintiff surely felt coerced by the challenged state action he or she is now seeking to remedy. On the flip side, if the government initiates administrative process against a would-be federal plaintiff, *Kercado-Melendez* would label that process coercive. But that would-be federal plaintiff, forced into the state-initiated administrative proceedings, can also be described as attempting to remedy governmental coercion through the administrative hearing. *Kercado-Melendez*'s interpretation of the coercive-remedial distinction, while easy to apply, does not explain why it modifies the *Younger* abstention doctrine.

The question we must therefore ask is whether administrative proceedings represent state enforcement efforts—regardless of who initiates them. As a leading treatise on federal court jurisdiction suggests, the inquiry is aimed at determining who is "*effectively* the 'plaintiff' or the 'defendant' before the agency—that is, whether the administrative proceeding was an enforcement action." Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts*

*and The Federal System* 1257 (5th ed. 2003) (emphasis added). The majority's approach, instead aligned with *Kercado-Melendez*, misses the point.

### b. Brown's Proceedings Were Coercive

Considering the underlying substance and nature of Brown's administrative proceedings, I agree with the district court that the proceedings represented Kansas's efforts at enforcing state Medicaid law against Brown. In the words the majority uses to describe coercive proceedings, Kansas here was seeking the "proactive enforcement of its laws." Majority Op. at 20.

As the district court correctly summarized, "[u]nder Kansas law, the termination of benefits to ineligible recipients is an enforcement mechanism designed to address violations of state Medicaid law." *Brown*, 477 F. Supp. 2d at 1117. Kansas "has joined the federal government and other states in guarding against providing healthcare for individuals who have their own resources." *Id.* (quoting *Miller v. Dep't of Soc. & Rehab. Servs.*, 64 P.3d 395, 399 (Kan. 2003)).

Several statutory provisions reinforce this conclusion. Benefit recipients have a duty under Kansas law to report changes in eligibility. Kan. Stat. Ann. § 39-719b (describing "the duty of the recipient to notify the secretary *immediately*," and the benefits paid in violation of that duty as "recoverable by the secretary as a *debt due* to the state" (emphasis added)). Benefits received in violation of that duty are described as "assistance . . . unlawfully received." *Id.* § 39-719c. And if failure to report amounts to fraud, the recipient "shall be guilty

- 7 -

of the crime of theft . . . and he shall be required to remit . . . the amount of any assistance given him under such fraudulent act." *Id.* § 39-720. From the perspective of the State of Kansas, then, Brown was an unlawful recipient of Medicaid benefits, and the state was acting in its enforcement role during Brown's administrative proceedings.

That Brown was the one to initiate an administrative hearing to challenge termination of her benefits does not matter. Under Supreme Court precedent, termination of welfare benefits "involves state action that adjudicates important rights" and triggers procedural due process rights, such as the right to a hearing. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970). Accordingly, by terminating Brown's benefits, the state effectively triggered the resultant administrative hearing, which it was required to provide. When Brown took advantage of that hearing, she was no more a "plaintiff" than was the person who used the available administrative process to challenge parking tickets in *O'Neill*, 32 F.3d at 787–88. Like the administrative process in *O'Neill*, Brown's administrative proceedings were thus coercive. And the end result of the relief sought by Brown was equal to the injunction sought in *Moore*, 396 F.3d 385—an order preventing Kansas from enforcing its Medicaid laws, which is nothing other than injunctive-type relief. Brown's preemptive federal court action against Kansas functions no differently than if Kansas had initiated cease-and-desist proceedings against her, which Brown then sought to stop.

- 8 -

Nor do I agree with the majority's "third factor" that argues coercive proceedings exist only where a state initiates an administrative proceeding to punish a federal plaintiff for a "bad act." The majority cites examples of bad acts from other coercion cases, including a trainer illegally giving performance-enhancing drugs to his horses, and a mining company running a well dry in violation of a state's environmental statutes. But calling something a "bad act" is simply another way of saying it "violates state law." And, as explained above, violating the law is precisely what Brown was doing when she was receiving Medicaid benefits to which she was not entitled under Kansas law. An element of subjective moral culpability seems unimportant to this inquiry. The majority's third factor thus weighs in *favor* of finding the proceedings here were coercive in nature.

Finally, the majority's variation of this argument also fails to persuade—namely, that Brown's proceedings cannot be considered coercive unless the State of Kansas, in addition to terminating benefits prospectively, was actually seeking (instead of just threatening) to recoup benefits received in violation of state law. But Kansas's important interest in ensuring that only the truly needy receive Medicaid assistance does not become any less important when Kansas uses something less than its full arsenal of enforcement measures to pursue an unlawful recipient. Moreover, it would be harmful policy, and one unjustified by *Younger* abstention principles, to require states in every case to use

the most coercive measures in enforcing their laws just so they can preserve abstention arguments.

Because Kansas's role in the hearing was to enforce Medicaid laws against an unlawful benefits recipient, the proceedings were coercive.

### 2. The Ongoing Proceeding Prong

In light of its determination that the proceedings here were remedial, the majority does not address whether Brown's state judicial process was ongoing when she filed her federal complaint. Because in my view the proceedings were coercive, making a proper *Younger* abstention determination requires that we also address whether the proceedings were ongoing. And, in this instance, the proceedings were indeed ongoing.

After reviewing the briefs and oral argument in this case, one can discern two well-reasoned (but ultimately unpersuasive) arguments that would support the opposite conclusion—namely, that the proceedings were *not* ongoing. Recall that here, the Kansas Health Policy Authority (HPA)[1] issued a final order, and Brown chose not to seek judicial review of that order in Kansas state courts. The first argument is that the issuance of an agency final order represents a point where the state process temporarily ceases to be ongoing, and the litigant can choose either

_____

[1] Although the briefs at times refer to the Kansas Division of Health Policy and Finance, it appears the HPA took over the administration of Medicaid programs in Kansas.

to continue in the state system or shift forum by filing a lawsuit in federal court. The second argument is that because Brown did not raise her federal issue in a hearing before the HPA, any state-court review of that issue would have been de novo. The process cannot be ongoing, this second argument goes, if subsequent review is de novo.

Neither of these reasons flows from the Supreme Court's explanation of *Younger* abstention. Nor does either comport with the clear weight of authority from other circuits—indeed, the reasons are plainly contradicted by that authority. I would therefore conclude Brown's state proceedings were ongoing when she filed the federal complaint.

   *a. The Ongoing Proceeding Prong and Right of Judicial Review in State Courts*

Neither the Supreme Court nor our circuit has yet addressed the exact issue of whether an administrative proceeding should be considered ongoing after an administrative agency issues a final order that is appealable, but not yet appealed, to state courts. But the Supreme Court's treatment of *Younger* abstention in the context of civil cases, although not administrative cases, at least strongly suggests that such administrative proceedings should be considered ongoing. *Younger* applies with equal force to criminal, civil, and administrative proceedings. *See Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999)

(explaining that *Younger* abstention is proper when "there is an ongoing state criminal, civil, or administrative proceeding").  The Supreme Court's explanation of the doctrine in the context of civil proceedings should thus be followed in the administrative context, unless good reasons exist for treating *Younger* abstention in these two contexts differently.

For *Younger* abstention in the context of state civil proceedings, the Supreme Court unambiguously stated that a natural break between trial and appellate stages of a proceeding does not destroy its ongoing nature.  *Huffman*, 420 U.S. at 608.  In *Huffman*, a civil nuisance lawsuit was brought in Ohio state court to close a movie theater screening pornographic films.  *Id.* at 598.  The movie theater lost the case in trial court but, instead of appealing the judgment within the state court system, filed a § 1983 lawsuit challenging Ohio's public nuisance statute as a violation of the First Amendment and requested declaratory and injunctive relief.  *Id.*  A three-judge panel of the federal district court reached the merits and agreed with the movie theater.

The Supreme Court reversed, holding unequivocally that a party seeking relief in a federal court "must [first] exhaust his state appellate remedies."  *Id.* at 608.  For the purposes of *Younger* abstention, then, trial and appellate stages of state court litigation should be treated as one continuous process that a litigant cannot truncate by filing a federal action halfway through state proceedings.  Otherwise, "all of the evils at which *Younger* is directed would inhere in federal

- 12 -

intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial." *Id.*

The Court identified three such evils. First, "[i]ntervention at the later stage is if anything more highly duplicative, since an entire trial has already taken place." *Id.* Whether or not state courts have had a chance to address the federal issue raised in subsequent federal litigation, the possible duplication of proceedings is a valid concern. The parties have already once assembled for a full trial in the state system. A second trial in federal court, even if it raises new issues, is sure to overlap to a significant extent with state proceedings.

Second, the Court in *Huffman* drew on *Younger*'s central theme: comity between federal and state courts. The Court explained a federal court's "[i]ntervention . . . [represents] a direct aspersion on the capabilities and good faith of state appellate courts." *Id.* When a federal court steps into the middle of the state judicial process after trial but before appeal, "it is likely to be even more disruptive and offensive because the State has already won" below. *Id.* at 608–09. By prohibiting litigants from sidestepping state appellate process, the result in *Huffman* promotes *Younger*'s central goal.

Third, "[f]ederal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of [federal] issues which arise in civil litigation over which they have jurisdiction." *Id.* at

- 13 -

609.  Federal law is supreme in our constitutional design, and state judges are bound to enforce it.  U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Testa v. Katt*, 330 U.S. 386, 393 (1947) (holding that state courts with jurisdiction to hear federal issues "are not free to refuse enforcement" of litigants' rights under federal law).  The *Huffman* Court pointedly refused "to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities."  420 U.S. at 611.

To protect against *Younger*'s three evils, the Court effectively introduced a new requirement into the *Younger* line of cases, "the exhaustion of state appellate remedies."  Owen M. Fiss, *Dombrowski*, 86 Yale L.J. 1103, 1139 (1977).  A litigant who has initiated state judicial proceedings must therefore exhaust any available state appellate remedies before filing a related federal action.[2]  These

---

[2]  The Court addressed the apparent tension between the exhaustion requirement of *Huffman* and the non-exhaustion principle of *Monroe v. Pape*, 365 U.S. 167 (1961), as follows.  *Monroe* held only that a federal § 1983 litigant need not first *initiate* state proceedings before filing the federal action.  *Huffman*, 420 U.S. at 609 n.21 (citing *Monroe*, 365 U.S. at 183).  *Huffman*, on the other hand, speaks to "the deference to be accorded state proceedings which have *already been initiated* and which afford a competent tribunal for the resolution of federal

(continued...)

- 14 -

remedies must be actively pursued, for the litigant "may not avoid the standards of *Younger* by simply failing to comply with the procedures of perfecting its appeal within the [state] judicial system." *Huffman*, 420 U.S. at 611 n.22.

After *Huffman*, at least regarding state civil trials, "a necessary concomitant of *Younger*" is that state trial and appellate stages are to be viewed as one ongoing judicial process. *Id.* at 608. Brown's case is admittedly different in that rather than dealing with state civil trial, it concerns state administrative proceedings, appealable upon their conclusion to state courts. The Supreme Court expressly left open the question whether the rationale in *Huffman* would apply to cases where a § 1983 claimant seeks federal court intervention after completion of the administrative hearing but before state court review of the agency's final order. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 369 & n.4 (1989) (*NOPSI*) (assuming, without deciding, "that the litigation, from agency through courts, is to be viewed as a unitary process that

---

[2](...continued)
issues." *Id.* (emphasis added). The relevant distinction is whether state proceedings have been initiated: *Monroe* says there is no need to initiate state proceedings, but if a litigant nevertheless chooses to do so, *Huffman* requires the litigant to follow the state system all the way through the available appeals. *Huffman*, in compliance with *Monroe*, does not force would-be § 1983 plaintiffs into the state system, but merely requires a litigant to accord the state system its due respect by first attempting to remedy an adverse ruling through state appellate procedures.

- 15 -

should not be disrupted, so that federal intervention is no more permitted at the conclusion of the administrative stage than during it").

Notably, one of the concurring opinions in *NOPSI* raised the possibility that the rationale of *Huffman*, as applied to administrative agency proceedings, might no longer be an open question. *Id.* at 374–75 (Blackmun, J., concurring in the judgment). Because the Court since *Huffman* has extended *Younger* into administrative proceedings that are judicial in nature, *see Dayton*, 477 U.S. at 627; *Amanatullah*, 187 F.3d at 1163, the "question whether abstention must continue through the judicial review process" may no longer exist. *NOPSI*, 491 U.S. at 375 (Blackmun, J., concurring in the judgment). The concurrence clearly suggested the question was no longer open.

I agree with this assessment of the *Younger* doctrine. In light of the Court's extension of *Younger* to state administrative proceedings, there is no principled reason for not applying *Huffman* to these proceedings, which are also judicial in nature, and treating them as ongoing through the completion of available state court judicial review. For a federal court to intervene before a state court has had a chance to review and possibly correct the challenged administrative order would give rise to the same concerns *Huffman* identified. The intervention would (1) result in some duplicative proceedings, (2) undermine state courts' capability of reviewing the challenged administrative decision's compliance with federal law, and (3) deprive state courts of their legitimate power

of judicial review. These concerns are no less meaningful in the administrative context than they are with respect to civil proceedings.

A majority of other circuits agree. Of the six circuit courts to address this issue, all but one apply the *Huffman* rationale to administrative proceedings, demanding a party exhaust available state court judicial review before filing a lawsuit in federal court. *See Laurel*, 519 F.3d at 166 (relying on *Huffman* to explain that a would-be federal court litigant "must exhaust his state administrative and judicial remedies and may not bypass them in favor of [a] federal court proceeding in which he seeks effectively to annul the results of a state administrative body" (quotation marks omitted)); *Maymo-Melendez v. Alvarez-Ramirez*, 364 F.3d 27, 35 (1st Cir. 2004) (noting that after *Huffman*, "*Younger* now has to be read as treating the state process—where the administrative proceeding is judicial in character—as a continuum from start to finish. There . . . cannot at any point on the continuum be an automatic right to detour into federal court because unhappy [sic] with an initial answer."); *Majors*, 149 F.3d at 713 & n.3; *O'Neill*, 32 F.3d at 790–91 & n.13; *Alleghany Corp. v. McCartney*, 896 F.2d 1138, 1143–44 (8th Cir. 1990). I would agree with these authorities.

The Fifth Circuit is alone in rejecting the application of *Huffman* reasoning in the context of administrative proceedings. *See Thomas v. Tex. State Bd. of Med. Exam'rs*, 807 F.2d 453, 456 (5th Cir. 1987). That court said, without an

explanation, "The mere availability of state judicial review of state administrative proceedings does not amount to the pendency of state judicial proceedings within the meaning of *Huffman*." *Id.* One has to wonder, though, why not? As explained above and consistent with the other circuits to have addressed this question, once the Supreme Court has extended *Younger* to state administrative proceedings, no principled reason exists against applying the *Huffman* reasoning to sequential state appellate proceedings—especially when, like here, the administrative proceedings themselves were judicial in nature. In *Majors*, the Seventh Circuit succinctly identified why the Fifth Circuit's approach should be avoided: "*Thomas* is unpersuasive because it was based on the distinction between administrative enforcement proceedings and civil enforcement proceedings of the *Huffman* variety, a distinction that is immaterial." 149 F.3d at 713 n.3.

I agree and would not make the doctrine turn on such an immaterial distinction. Accordingly, I believe that declining to apply *Huffman* to administrative proceedings would be erroneous. Like five of our sister circuits, I would hold that state court judicial review of administrative proceedings represents an integral part of state administrative process—which *Younger* says cannot be cut off at a midpoint in favor of federal court litigation.

### b. Brown's Proceedings Were Ongoing

The State of Kansas clearly affords an opportunity "for judicial review of [an administrative agency's] final order." Kan. Stat. Ann. § 77-613(b). In

performing its judicial review function, a state court "shall grant relief" if, among other things, "the agency has erroneously interpreted or applied the law." *Id.* § 77-621(c)(4). Kansas state courts, therefore, have jurisdiction to review Brown's federal claims—namely, her challenge to the HPA's decision as a violation of federal Medicaid law.

For a federal court to intervene before Kansas state courts have had a chance to review the HPA's final order would cast doubt on the ability of Kansas courts to correct the agency's alleged violation of federal law. Moreover, the intervention would undermine state courts' legitimate function of reviewing decisions of Kansas administrative agencies. Finally, the intervention duplicates to some extent the proceedings before the HPA. For all of these reasons, the district court was correct to abstain, and I would affirm that decision.

I recognize that my approach to *Younger* abstention may leave Brown without a remedy here. The time to appeal her administrative proceedings to Kansas state courts has long since run. *But see Brown v. Day*, No. 06-2212, 2006 WL 3087111, at *4 n.7 (D. Kan. Oct. 27, 2006) ("Because Kansas law recognizes the unique circumstances doctrine, . . . it may be possible for plaintiff to resurrect her state claim." (citing *In re Appeal of Sumner County*, 930 P.2d 1385, 1388 (Kan. 1997)). As the Supreme Court explained, however, a federal litigant "may not avoid the standards of *Younger* by simply failing to comply with the procedures of perfecting its appeal within the [state] judicial system." *Huffman*,

- 19 -

420 U.S. at 611 n.22.  Brown therefore had the burden to perfect her state appeal before filing this § 1983 action.  That she failed to do so should not affect our interpretation of *Younger* abstention.

### c.  De Novo Exception

As indicated above, the second major argument against applying *Younger* here is that, even if Brown had sought judicial review of the HPA's final order in Kansas state courts, the review would have been de novo since the issue presented could not have been addressed by the agency.  Given this posture, the second argument goes, Brown's proceedings cannot be considered ongoing.

I disagree with both the premise and the conclusion.  Regarding the premise, I am not persuaded Brown was prevented from raising her federal claim before the HPA.  And as to the conclusion, assuming Brown could not in fact present the federal claim to the HPA, *Younger* requires nothing more than an opportunity to raise that claim during subsequent judicial review of an administrative decision.  The de novo argument does not follow from the *Younger* abstention doctrine.

### Raising Federal Claims Before the HPA

In the first place, we have no idea whether the HPA would have been receptive to Brown's arguments under federal Medicaid law.  And "the burden on this point rests on the federal plaintiff to show that state procedural law barred presentation of its claims."  *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987)

(quotation marks, brackets, and citation omitted). Brown, however, never raised her federal arguments in the HPA proceedings. In such a situation, the Supreme Court instructs we must assume that Brown could have raised these claims before the HPA—unless unambiguous contrary authority exists. *See id.* at 15 ("[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary."); *accord O'Neill*, 32 F.3d at 792–93. Thus, we must consult Kansas state law to see whether it unambiguously prevents the HPA from considering federal Medicaid law during benefit termination proceedings.

In my view, Kansas law does not unambiguously prevent benefit recipients like Brown from asserting federal claims in proceedings before the HPA. The relevant jurisdictional statute instructs HPA hearing officers as follows: "The department of social and rehabilitation services shall not have jurisdiction to determine the facial validity of a state or federal statute. An administrative law judge from the office of administrative hearings shall not have jurisdiction to determine the facial validity of an agency rule and regulation." Kan. Stat. Ann. § 75-3306(h). Brown argues the HPA was thus jurisdictionally prohibited from considering her federal law claims.

But a facial challenge is by no means the only way of raising federal issues. Brown could have presented an as-applied challenge. *Younger* does not require an opportunity to levy a facial challenge.

Furthermore, Kansas case law would not have unambiguously precluded Brown from raising her federal issues. State case law does exist indicating Kansas administrative agencies are not empowered to *decide* constitutional questions. *See, e.g.*, *Bd. of Educ. of Unified Sch. Dist. No. 443 v. Kan. State Bd. of Educ.*, 966 P.2d 68, 76 (Kan. 1998). But it would be erroneous to conclude Brown could not have *raised* her constitutional claim before the agency. Indeed, the most recent Kansas Supreme Court case to address this issue concluded "[t]he rule that a constitutional issue cannot be *decided* by an administrative agency does not necessarily preclude [an individual] from *raising* such an issue in that forum." *Martin v. Kan. Dep't of Revenue*, 176 P.3d 938, 946 (Kan. 2008).

This ability to raise a constitutional issue in state administrative proceedings is relevant for a number of reasons. First, one's ability to raise the same issues at the administrative level as at the state court level gives weight to the view that both comprise one unitary proceeding for the purposes of *Younger* abstention. Second, it means that if the HPA can be made aware of the federal issues, it can construe the challenged Kansas statute to avoid the federal question altogether. Thus, even if not empowered to decide the constitutional issue, the agency may avoid the entire federal conflict. And third, it cuts against the

argument that Brown was unambiguously precluded from asserting her federal claim. All that *Younger* abstention asks is whether Brown could have raised her federal claim before the HPA. Whether or not Brown would have succeeded in challenging the offending Kansas statute as applied to her case is immaterial.

And again, under the jurisdictional prohibition against facial challenges, that still leaves as-applied challenges and narrowing constructions, either of which could have adequately resolved Brown's complaint and obviated the need for her federal lawsuit. Accordingly, there is no unambiguous authority suggesting the HPA was prohibited from considering Brown's federal Medicaid arguments.

The administrative proceedings support this view. Brown had succeeded in her initial proceedings before the hearing officer but the agency head later overturned the result. The initial determination in Brown's favor rested on equitable considerations of avoiding retroactivity in applying new Kansas statutory law to Brown's preexisting benefits. It is not at all clear why proceedings that were equitable in nature could not have addressed federal Medicaid law among all other equitable considerations.

It may be possible that Brown could have raised an as-applied challenge before the HPA, that the HPA could have construed the offending Kansas statute narrowly to avoid the federal Medicaid law claim, or that the equitable nature of HPA proceedings could have taken federal Medicaid law into account. But most

importantly, the Supreme Court instructs the assumption that in the absence of unambiguous authority to the contrary, Brown could have raised her federal claim in one shape or another before the HPA. *Pennzoil*, 481 U.S. at 15; *see also Dayton*, 477 U.S. at 629 ("But even if Ohio law is such that the Commission may not consider the constitutionality of the statute under which it operates, it would seem an unusual doctrine . . . to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles.").

The burden is on Brown to demonstrate the contrary, and she failed to do so. Her sole argument on this score relies on the HPA's inability to address facial challenges to state welfare statutes, but this argument says nothing of other means by which Brown could have raised her federal claims before the HPA.

*The De Novo Nature of State Court Review Is Immaterial*

Even assuming for purposes of argument that Brown indeed could not raise her federal claim before the HPA, she could have raised this issue during state-court judicial review of the agency's final order. Kan. Stat. Ann. § 77-617(a) ("A person may obtain judicial review of an issue that was not raised before the agency, only to the extent that . . . [t]he agency did not have jurisdiction to grant an adequate remedy based on a determination of the issue . . . ."). And an opportunity to raise a federal issue during state court judicial review of administrative proceedings is all *Younger* requires. *See Dayton*, 477 U.S. at 629 (holding that adequate opportunity to raise federal issues exists when such claims

- 24 -

"may be raised in state-court judicial review of the administrative proceeding,"
even if the claims could not have been raised during the administrative
proceeding itself).

The contrary argument essentially relies on the following premise:  We
abstain only when a federal issue has been raised somewhere in the course of state
proceedings, not simply when state process itself has been initiated.  But this
cannot be correct.  In *Dayton*, the Supreme Court applied *Younger* abstention
without a federal issue ever being raised in the ongoing state administrative
proceedings.  *Id.*  If the focus of *Younger* abstention looks strictly to a state's
resolution of a federal issue, then *Dayton* would make no sense.  Why abstain in
favor of an ongoing administrative proceeding that lacks jurisdiction to address
federal issues, requiring a would-be federal litigant to wait until state court
judicial review to raise such issues?  Abstention in these situations makes sense
only if we look at the state process as a whole, including any available judicial
review, de novo and otherwise.  This must have been what animated the Court in
*Dayton* and makes perfect sense in light of the Court's treatment of the trial and
appellate stages as one whole in *Huffman*.

The opposite conclusion leads to an absurd result where federal court
abstention depends on the availability of state-court judicial review while the
agency is deciding a case, *see Dayton*, 477 U.S. at 629, only to then ignore the
availability of state court judicial review and deny abstention once the agency has

- 25 -

decided. A more consistent approach is to treat state court judicial review as an integral part of state administrative process. Under this approach, federal courts would abstain during the pendency of the agency's proceedings and during the state court's review of the agency's order. This would let state courts play a role assigned them by state legislatures, which is to supervise administrative adjudications.

Other circuits agree that the de novo exception does not belong in the *Younger* abstention doctrine. On facts similar to Brown's case—where administrative proceedings had ended but state court judicial review had not been sought—the First, Third, Fourth, and Eighth Circuits declined to write the de novo exception into *Younger*. *See Moore*, 396 F.3d at 395–96; *Maymo-Melendez*, 364 F.3d at 36; *O'Neill*, 32 F.3d at 793; *Alleghany Corp. v. Pomeroy*, 898 F.2d 1314, 1317–18 (8th Cir. 1990).

The Eighth Circuit in *Pomeroy* provided a particularly illuminating discussion of the reasons why *Younger* abstention does not contain the de novo exception advanced by the majority here. When a state provides for judicial review of administrative proceedings in its courts and allows them to consider certain claims de novo, two important interests are triggered. *Pomeroy*, 898 F.2d at 1317–18. First, state courts may interpret the challenged state law in a way that obviates a federal issue. *Id.* at 1317 (citing *Pennzoil*, 481 U.S. at 11). Second, if in fact state law is incompatible with federal law, "interests of comity

are advanced, and friction reduced, if the courts of a state, rather than the federal courts, determine that [federal law] requires the state to alter its practices." *Id.* at 1318 (citing *Huffman*, 420 U.S. at 608–09). Although the court in *Pomeroy* articulated both of these interests in terms of complying with federal constitutional law, the same can be said of federal statutory law. The Supremacy Clause of the Constitution places state courts under equal duty to decide federal constitutional as well as statutory cases. U.S. Const. art. VI, cl. 2. For these reasons, *Pomeroy* decided against grafting the de novo exception onto the *Younger* abstention doctrine.

As Brown's case comes to us, because she chose not to seek judicial review of the HPA's final order in state courts, we have no idea whether the challenged Kansas welfare statute actually raises an issue under federal Medicaid law. We thus violate the mutual respect between the federal and state courts by assuming that Kansas state courts could not interpret Kansas statutory law to avoid a federal issue. I reject the de novo exception because it invites this precise assumption. All *Younger* requires is that federal claims be capable of resolution "somewhere in the state process." *Maymo-Melendez*, 364 F.3d at 36.

\* \* \*

In sum, contrary to the majority's holding, in my view Brown's proceedings were coercive. And though the majority does not address the issue, the proceedings were also ongoing. Because the *Younger* elements are satisfied,

the district court properly abstained, as should we.  *See Amanatullah*, 187 F.3d at 1163 ("*Younger* abstention is non-discretionary; it must be invoked once the . . . conditions are met, absent extraordinary circumstances.").

I therefore respectfully dissent.